## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ADAM WAYNE TYLER ROBERTS,

    *Plaintiff*,

    v.                           Case No. 8:18-CV-1062-T-33TGW

PAM BONDI and RICK SWEARINGEN;    **DISPOSITIVE MOTION**

    *Defendants*.

_____/

## DEFENDANTS' MOTION TO DISMISS AND
## INCORPORATED MEMORANDUM OF LAW

Plaintiff Adam Wayne Tyler Roberts sued Pam Bondi in her official capacity as Florida's Attorney General and Rick Swearingen in his official capacity as Commissioner of the Florida Department of Law Enforcement. He alleges that Florida's recently passed legislation prohibiting the possession, sale, or purchase of bump-fire stocks violates both the U.S. Constitution and Florida's Constitution. Defendants hereby move to dismiss Plaintiff's complaint in its entirety. The Eleventh Amendment bars Plaintiff's claims against the Attorney General and Plaintiff lacks standing to sue her, so this Court should dismiss the Attorney General as a defendant. *See* Fed. R. Civ. P. 12(b)(1). Moreover, for the reasons discussed below, Plaintiff fails to state any claim upon which relief may be granted; this Court should therefore dismiss his complaint entirely. *See* Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

### A.    The Statute.

In March 2018, the Florida Legislature passed the Marjory Stoneman Douglas High School Public Safety Act, which in part created Section 790.222, Florida Statutes, making it a

third-degree felony to "import into [Florida] or transfer, distribute, sell, keep for sale, offer for sale, possess, or give to another person a bump-fire stock." The statute defines the term "bump-fire stock" as "a device used to alter the rate of fire of a firearm to mimic automatic weapon fire or which is used to increase the rate of fire to a faster rate than is possible for a person to fire such semiautomatic firearm unassisted" by such a device. § 790.222, Fla. Stat. This provision takes effect October 1, 2018.

### B.  Plaintiff's Complaint.

Plaintiff alleges that he is a Florida resident who owns bump-fire stocks and "other firearms that," in his view, "may be construed to be Bump Fire Stocks through trigger modifications and fire control group upgrades." Compl. ¶ 32. Plaintiff claims that Section 790.222 violates both the U.S. Constitution and Florida's Constitution: He argues that it operates as an unconstitutional taking of his property without compensation (Counts 1-4); violates the Second Amendment (Counts 5-6); violates the Equal Protection Clause (Counts 7-8); and is unconstitutionally vague (Counts 9-10).

### C.  Bump-Fire Stocks.

Plaintiff's claims do not all relate to bump-fire stocks. Counts 5 through 10 are premised on his argument that the statute's definition covers, and therefore the statute prohibits, other types of firearm modifications. It is therefore important to understand the distinction between bump-fire stocks and the other types of modifications to which Plaintiff refers.

Semiautomatic firearms can fire only one round per operation of the firearm's firing mechanism—one round per trigger pull—as opposed to automatic firearms (also known as "machine guns"), which can fire "automatically more than one shot, without manual[ly] reloading, by a single function of the trigger." *See* § 790.001(9), Fla. Stat. (defining "[m]achine

gun"); 26 U.S.C. § 5845(b) (defining "machinegun"). With minor exceptions not applicable here, modifying a semiautomatic firearm to allow it to fire multiple rounds with a single pull of the trigger is illegal under federal and state law. A bump-fire stock is a modification to a semiautomatic firearm that allows a user to fire multiple rounds with a single operation of the firearm's firing mechanism—the application of constant forward pressure against the front portion of the firearm—by harnessing the weapon's natural recoil, while still technically requiring a depression of the trigger for each round fired. *See* Bill Analysis & Fiscal Impact Statement, SB 7026 at 13 (Feb. 28, 2018) ("Fla. Senate Report") (citing various news sources).[1]

Each time a user fires a semiautomatic rifle, the weapon recoils against the user's shoulder. A bump-fire stock replaces the weapon's buttstock and related components with a mechanism that, with the application of constant forward pressure on the front portion of the firearm, causes the trigger to "bump" against the user's finger each time the weapon recoils. To fire multiple rounds with an unmodified semiautomatic weapon, the user must pull the trigger multiple times; with a bump-fire stock equipped firearm, the user need only apply constant forward pressure to the front portion of the firearm and the bump-fire stock will allow the trigger to repeatedly bump against the user's finger in rapid succession, causing the discharge of multiple rounds with only a single operation of the bump-fire stock. In other words, without a bump-fire stock, a single operation of the firearm's firing mechanism (in that case a pull of the trigger) results in the firing of one round; with a bump-fire stock, a single operation of the firing

---

[1] Footnote 64 of the Florida Senate Report cites two online news sources, both of which contain helpful video demonstrations of how bump-fire stocks function. *See* Fla. Senate Report at 13 n.64 (citing Julie Vitkovskaya & Alex Horton, Wash. Post, *Trump recommended outlawing bump stocks. Here's what they are.*, February 20, 2018, *available at* https://www.washingtonpost.com/news/checkpoint/wp/2017/10/05/what-are-bumpstocks/?utm_term=.c0d30fa732a8; Jennifer Earl, Fox News, *What are bump stocks? How they work and why Trump wants them banned*, February 21, 2018, *available at* http://www.foxnews.com/us/2018/02/20/whatare-bump-stocks-how-work-and-why-trump-wants-them-banned.html).

3

mechanism (the application of forward pressure to the bump-fire stock) results in the firing of multiple rounds.

Rifles modified with a bump-fire stock are unreasonably dangerous not only because of the increased rate of fire but also because they are inaccurate and difficult to control. *Id.* The National Rifle Association therefore bans their use at its gun ranges and has asked the federal government to review their legality. *See* Lorraine Woellert, *NRA Bans Bump Stocks at Its Own Firing Range*, POLITICO (Oct. 5, 2017);[2] *NRA's Wayne LaPierre and Chris Cox Issue Joint Statement*, NATIONAL RIFLE ASSOCIATION (Oct. 5, 2017).[3] The Administration has accepted the National Rifle Association's recommendation and, at the President's direction, has noticed a proposed rulemaking that would classify bump-fire stocks "and devices with certain similar characteristics" as machineguns under federal law, thus rendering them contraband on a national level. *See* 83 Fed. Reg. 13,442 (Mar. 29, 2018) ("Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices"); 83 Fed. Reg. 7,949 (Feb. 20, 2018) ("Presidential Memorandum on the Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices"). Bump-fire stocks began to receive broad public attention in 2017 after a shooter used them to kill 59 people and injure more than 500 others in Las Vegas, Nevada. *See* Fla. Senate Report at 14.

### D.    Other Firearm Modifications.

Undergirding Plaintiff's Second Amendment, Equal Protection, and Due Process claims are his assertions that the statute could, or does, prohibit other types of firearm modifications; Plaintiff does not claim simply that outlawing bump-fire stocks would be unconstitutional, he

---

[2] *Available at* https://www.politico.com/story/2017/10/05/nra-bump-stock-ban-firing-ranges-243495.

[3] *Available at* https://home.nra.org/joint-statement.

also claims that its potential application to other firearm modifications would be unconstitutional. Specifically, he asserts that the statute would prohibit "[a]ny fire control modification that allows the trigger of a firearm to be pulled faster," listing as examples "any trigger modifications, trigger packs, trigger assemblies, trigger jobs, multi-stage triggers," an "adjustable trigger," a "short-reset trigger," and a "2-stage trigger." Compl. ¶ 27. His Second Amendment claims focus on "2-stage triggers and short-reset triggers." Compl. ¶¶ 61, 67.

The specific firearm and trigger modifications referenced in the Complaint have commonly understood definitions. A two-stage or multi-stage trigger is a trigger that divides the pull between two stages of different pull weights and travel distances, which allows the shooter to more precisely control the moment of discharge. It does not allow a firearm to fire more than one round per trigger pull.[4] A short-reset trigger, as its name suggests, allows a firearm to be ready to discharge again after only a short reset of the trigger, but another pull of the trigger is still required to discharge each round.[5] An adjustable trigger allows adjustments of its pull weight, pull distance, or other similar characteristics. But again, an adjustable trigger does not allow a firearm to discharge more than one round per trigger pull.[6] A trigger assembly or trigger pack is simply the collection of parts comprising the trigger and related components.[7] Finally, a fire control group is the collection of parts comprising all the mechanisms that control the trigger's operation and ability to discharge the firearm.[8]

---

[4]   *See*   https://www.shootingillustrated.com/articles/2016/11/29/single-stage-vs-double-stage-triggers/; https://www.timneytriggers.com/blog/2017/11/12/the-differences-between-two-stage-and-single-stage-replacement-triggers/.

[5] *See* https://www.realgunreviews.com/theres-no-trigger-in-a-short-reset-trigger-kit/.

[6] *See* https://www.americanrifleman.org/articles/2011/8/30/how-to-adjust-adjustable-triggers/.

[7] *See* https://patents.google.com/patent/US20150253095.

[8] *See* http://firearmshistory.blogspot.com/2013/04/parts-of-firearm-fire-control-group.html.

In sum, unlike a bump-fire stock, these trigger modifications do not allow the discharge of more than one round per single operation of the firearm's firing mechanism. As discussed below, this distinction is legally significant here.

## LEGAL STANDARD

When assessing a motion to dismiss, this Court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). But the complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must have "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Twombly*, 550 U.S. at 570).

## ARGUMENT

I.   **THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST THE ATTORNEY GENERAL.**

   A.   **The Eleventh Amendment bars Plaintiff's claims against the Attorney General.**

Under "the Eleventh Amendment, a state may not be sued in federal court unless it waives its sovereign immunity or its immunity is abrogated by an act of Congress under section 5 of the Fourteenth Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). In *Ex Parte Young*, 209 U.S. 123 (1908), the United States Supreme Court created a narrow exception for suits seeking to enjoin state officials from violating the U.S. Constitution on a prospective basis. That exception turns on the state official's enforcement authority: In *Ex Parte Young*, the Court held that the Missouri Attorney General was a proper party because his duties included "the right and the power to enforce the statutes of the state, including . . . the act in question."

6

209 U.S. at 161; *see also ACLU v. Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) (holding that the Florida Bar was a proper defendant because of its "authority to seek sanctions" for violations of ethics rules); *Luckey v. Harris*, 860 F.2d 1012, 1016 (11th Cir. 1988) (Georgia's governor was proper defendant because he was "responsible for law enforcement" and he "ha[d] the residual power to commence criminal prosecutions" and to "direct the Attorney General to 'institute and prosecute'").

By contrast, the Eleventh Circuit and the other "federal courts have refused to apply *Ex parte Young* where the officer who is charged has no authority to enforce the challenged statute." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999); *see Grizzle*, 634 F.3d at 1319 (explaining that a state official is subject to suit only "when his office imbues him with the responsibility to enforce the law or laws at issue in the suit"). This requirement serves an important purpose. If the "constitutionality of every act passed by the legislature could be tested by a suit against the . . . attorney general, based upon the theory that . . . [she] might represent the state in litigation involving the enforcement of its statutes," it would eviscerate "the fundamental principle that [States] cannot, without their assent, be brought into any court at the suit of private persons." *Ex Parte Young*, 209 U.S. at 157; *see Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) (holding that an official's "'general executive power' is not a basis for jurisdiction in most circumstances," because if it were, "any state statute could be challenged simply by naming the governor as a defendant"); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) (explaining that requirement of sufficient connection "prevents parties from circumventing a State's Eleventh Amendment immunity"). [9] Moreover, as discussed below, this

---

[9] *See also*, *e.g.*, *Mendez v. Heller*, 530 F.2d 457, 460 (2nd Cir. 1976) ("The Attorney General has no connection with the enforcement of [the statute], and therefore cannot be a party to this suit."); *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) (plurality opinion) (holding that the Attorney General was not a proper party because the Attorney General did not have a special enforcement connection to the challenged statute);

requirement of enforcement authority also avoids the issuance of unconstitutional advisory opinions: If an official cannot enforce an act against the plaintiff, enjoining the official cannot redress the plaintiff's injury.

For these reasons, district courts in Florida have previously dismissed Florida's Attorney General as an improper defendant because he had "no role . . . in the enforcement of the criminal statute," explaining that "the only proper Defendant for the challenge to the criminal statute" was the State Attorney, which is the official who "enforces criminal law in Florida, not the Florida Attorney General." *Freiberg v. Francois*, No. 4:05-cv-177, 2006 WL 2362046, at *6 (N.D. Fla. Aug. 15, 2006) (Sherrill, M.J.), *report & recommendation adopted* (citing Art. V, s. 17, Fla. Const.); *see also Fla. Hometown Democracy, Inc. v. Browning*, No. 4:08-cv-373, 2008 WL 4081174, at *5 (N.D. Fla. Aug. 29, 2008) (dismissing Florida's Secretary of State as improper party where plaintiffs did not allege that he enforced challenged statute and where "there is no indication under Florida law that he does").

Dismissal is warranted under these principles. Plaintiff does not allege that the Attorney General is specifically authorized to prosecute violations of Section 790.222; that is because she is not. Instead, he conclusorily alleges that "[a]s Attorney General, she is responsible for directing and supervising the prosecution of all offenses against Florida's criminal law, including the ban on Bump Fire Stocks at issue in this case." Compl. ¶ 17. Plaintiff is mistaken. Under Florida's Constitution, state attorneys—not the Attorney General—are "the prosecuting officer[s] of all trial courts in [their respective] circuit[s]," subject only to exceptions not

---

*1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."); *Bolbol v. Brown*, 120 F. Supp. 3d 1010, 1018 (N.D. Cal. 2015) (finding an allegation that California's Attorney General, as its "chief legal officer," has "[a] 'general duty to enforce California law'" to be "plainly insufficient to invoke the *Ex Parte Young* exception to Eleventh Amendment immunity"); *June Med. Servs., LLC v. Caldwell*, No. 3:14-cv-525, 2014 WL 4296679, at *3 (M.D. La. Aug. 31, 2014) (holding that Louisiana Attorney General's "broad power" as state's chief legal officer was insufficient to trigger *Young*).

applicable here.[10] Art. V, § 17, Fla. Const.; *State v. Barritt*, 531 So. 2d 338, 342 (Fla. 1988) ("[T]he state attorney has complete discretion in deciding whether and how to prosecute."); *see Freiberg*, 2006 WL 2362046, at \*6. In other words, "[w]ith respect to the prosecution of crimes, the State acts exclusively through the offices of the state attorneys," and "[n]o other officers or agencies of the State are vested with that responsibility or power." *Cook v. State*, 921 So. 2d 631, 644 (Fla. 2d DCA 2005); *see also Johnson v. State*, 314 So. 2d 573, 577 (Fla. 1975) ("In both the adult and juvenile divisions of our court system, the State Attorney is the prosecuting officer."); *Austin v. State ex rel. Christian*, 310 So. 2d 289, 292 (Fla. 1975) ("A state attorney in Florida is not merely a prosecuting officer in the circuit in which he is elected, he is also an officer of the State in the general matter of enforcement of the criminal law."). Thus, because the Attorney General does not "have any relationship to the enforcement of [the challenged] provision, . . . the *Ex Parte Young* doctrine does not apply." *Summit Med. Assocs.*, 180 F.3d at 1342.

To be sure, the Attorney General is Florida's "chief state legal officer." Art. IV, § 4(b), Fla. Const. She has considerable discretion to act in the public interest and, when necessary, to defend state statutes; for example, she is the only official authorized to represent Florida's state interests in federal court, and she may intervene in cases "in which the state may be a party, or in anywise interested." *State of Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976). These powers, however, do not provide the sort of direct connection to the challenged statute that *Ex Parte Young* demands. *See, e.g., Mallory v. Harkness*, 923 F. Supp. 1546, 1553 (S.D. Fla. 1996), *aff'd without opinion*, 109 F.3d 771 (11th Cir. 1997) ("It has long been recognized that

---

[10] The Attorney General may prosecute "violations of municipal ordinances," Art. V, § 17, Fla. Const., and—through the Statewide Prosecutor—violations of certain enumerated "criminal laws occurring or having occurred, in two or more judicial circuits as part of a related transaction, or when any such offense is affecting or has affected two or more judicial circuits as provided by general law," Art. IV, § 4(b), Fla. Const. Section 790.222 is neither a municipal ordinance nor one of the specific statutes that the Statewide Prosecutor is authorized to enforce. *See* Fla. Stat., § 16.56.

the [Attorney General] is not a necessary party each time the constitutionality of a statute is drawn into question . . . The [Attorney General] is thus not affirmatively required to intervene every time an entity challenges the constitutionality of a statute." (citations omitted)). And forcing the Attorney General to defend the constitutionality of a statute would eviscerate her unreviewable discretion under Florida's Constitution. *See State ex rel. Landis v. S. H. Kress & Co.*, 155 So. 823, 828 (Fla. 1934), *superseded by statute on other grounds as stated in State ex rel. Watson v. Dade Cty. Roofing Co.*, 22 So. 2d 793, 794 (1945).

Two other decisions warrant discussion. In *Bugoni v. Scott*, No. 8:13-cv-1224, 2015 WL 1508422 (M.D. Fla. Apr. 1, 2015), a pro se plaintiff sued the Governor of Florida, challenging the constitutionality of a criminal statute. The Governor moved to dismiss, arguing that "state attorneys and sheriffs, rather than the Florida governor, enforce the challenged statute," and the court granted the motion. *Id.* at *2. In dicta, the court stated that the statute at issue "[wa]s enforced by 'parties other than the governor,' namely *the attorney general, the statewide prosecutor*, and the state attorneys." *Id.* (emphasis added). Yet the court cited only the constitutional provisions discussed above, which explain that only the *state attorneys* have prosecutorial authority. In any event, unlike here, the Statewide Prosecutor had authority to prosecute inter-circuit violations of the statute at issue in that case.

Similarly, although the district court in *Teltech Systems, Inc. v. McCollum* stated that Florida's Attorney General was "a proper defendant in a suit challenging the constitutionality of a state criminal statute," that decision is neither binding nor persuasive. No. 08-cv-61664, 2009 WL 10668266, at *2 (S.D. Fla. June 29, 2009). In its brief analysis, the court first cited *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73 (4th Cir. 1991), and *Wilson v. Stocker*, 819 F.2d 943 (10th Cir. 1987), but both are distinguishable.

In *Mobil Oil*, the court held that Virginia's Attorney General had enforcement authority because a statute specifically provided that he could "investigate and bring an action in the name of the Commonwealth to enjoin any violation" of the statutes at issue. 940 F.2d at 75, 77 (citing Va. Code § 59.1-68.2). No similar provision exists with respect to Florida's Attorney General.

And in *Wilson*, the Oklahoma Attorney General did not argue that he was not the official charged with enforcement; as a result, the court did not hold that he was. Instead, the court simply rejected his argument that, because his office was not involved in Wilson's arrest and threatened prosecution, he was immune from suit. 819 F.2d at 946. To round out its analysis, the *McCollum* court also relied on two cases where "the Eleventh Circuit has referred to the state attorney general as the chief law enforcement officer of the state." *Id.* at *2. Yet one of those cases involved the *Alabama* Attorney General, who at the time had specific enforcement power. *See* Ala. Stat. § 36-15-14; *Graddick v. Galanos*, 379 So. 2d 592, 594 (Ala. 1980). In the other case, the court simply recognized that Florida's Attorney General is the "state's chief legal officer." *State of Florida v. Exxon Corp.*, 526 F.2d 266, 270 (5th Cir. 1976). As explained herein, however, the discretionary authority to intervene to defend a statute is fundamentally distinct from the power to enforce criminal statutes in the first instance. Thus, this Court should decline to follow *McCollum*, as well, as unpersuasive.

The Eleventh Amendment bars this Court from exercising jurisdiction over Plaintiff's suit against the Attorney General because she has no authority to enforce the challenged statute and thus lacks the requisite connection to the statute under *Ex Parte Young*. This Court should therefore dismiss the Attorney General from this suit for lack of subject-matter jurisdiction.

**B.      Plaintiff lacks standing to sue the Attorney General.**

This Court should also dismiss the Attorney General from this case because Plaintiff lacks Article III standing to assert his claims against her. If an official cannot enforce an act against the plaintiff, enjoining the official cannot redress the plaintiff's injury. *See, e.g., Gallardo by & through Vassallo v. Senior*, No. 4:16-cv-116, 2017 WL 3081816, at *6 (N.D. Fla. July 18, 2017) ("If relief is sought against an official who cannot remedy the plaintiff's alleged injury, there is no 'case or controversy between himself and the defendant[s] within the meaning of Art[icle] III.'" (citing *Scott v. Taylor*, 405 F.3d 1251, 1259 (11th Cir. 2005) (Jordan, J., concurring))); *see also Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (dismissing, for lack of standing, supervisors of elections who had "no source of power" to enforce provision at issue); *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017) (affirming dismissal of suit against attorney general for lack of standing where attorney general did not enforce challenged statutes); *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (dismissing Michigan Attorney General as improper party where plaintiffs did not allege how he "was involved in the issuance of . . . licenses or the enforcement of rules" at issue).

As discussed, the Attorney General has no authority to enforce Section 790.222. And an order enjoining the Attorney General "from enforcing Fla. Stat. § 790.222" and "from applying Fla. Stat. § 790.222" (Compl. ¶¶ 96(b), (c)) would not prevent state attorneys from prosecuting Plaintiff for violating Section 790.222. Thus, he has no standing to sue the Attorney General.

**II.     THIS COURT SHOULD DISMISS COUNTS 1 THROUGH 4 BECAUSE PLAINTIFF FAILS TO STATE A TAKINGS CLAIM UNDER EITHER THE U.S. CONSTITUTION OR FLORIDA'S CONSTITUTION.**

Plaintiff asserts that Section 790.222 violates both the Fifth Amendment to the U.S. Constitution and Article X Section 6(a) of Florida's Constitution because, in his view, it "is in-effect a taking" of his property and "[t]here is no compensation provided for this taking." Compl.

¶¶ 35, 36, 41, 42, 48, 49, 55, 56; *see* Compl. ¶¶ 20-23. These claims fail, however, because Section 790.222 does not effect any taking; instead, it prohibits the possession of contraband.

Under the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." Similarly, Article X, Section 6(a) provides that "private property shall [not] be taken except for a public purpose and with full compensation therefor." The Florida Supreme Court has consistently "interpreted the takings clause of the Fifth Amendment and the takings clause of the Florida Constitution coextensively." *St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So. 3d 1220, 1222 (Fla. 2011) (collecting cases), *rev'd on other grounds*, 570 U.S. 595 (2013); *see also Lee Cty. v. Sunbelt Equities, II, Ltd. P'ship*, 619 So. 2d 996, 1007 (Fla. 2d DCA 1993) (per curiam) (explaining that the tests are "substantially the same"). As a result, Plaintiff's claims under the U.S. Constitution and Florida's Constitution are analyzed together below.

The Takings Clause does not apply to the forfeiture of contraband pursuant to the government's police powers. *See*, *e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 669 (1887) ("A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit."); *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 336 (7th Cir. 2011) (holding that Takings claim was a "non-starter" where the government's actions "were taken under the state's police power"); *United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845 (8th Cir. 1999) ("[T]he forfeiture of contraband is an exercise of the government's police power, not its eminent domain power."); *McKenna v. Portman*, 538 F. App'x 221, 224 (3d Cir. 2013) (explaining that no Takings claim exists when property is seized "pursuant to the criminal laws"); *Rhaburn v. United States*, 390 F. App'x 987, 988 (Fed. Cir. 2010) ("The seizure of property pursuant to police power is 'an exercise that has

13

not been regarded as a taking for public use for which compensation must be paid.'"); *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979) ("[A] taking for the public benefit under a power of eminent domain is . . . to be distinguished from a proper exercise of police power to prevent a perceived public harm, which does not require compensation.").

It is of no moment that the property now considered contraband was lawfully acquired. For example, "[t]he Supreme Court [has] consistently rejected takings challenges to Prohibition-era regulations of previously acquired stock." *Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404, 410 (4th Cir. 2007) (citing *Everard's Breweries v. Day*, 265 U.S. 545, 563 (1924), & *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 303 (1920)); *see also Fesjian*, 399 A.2d at 865-66 (ban on machine guns was not taking). Indeed, "[t]he government may not be required to compensate an owner" for the seizure of property that "facilitated and was used in criminal activity," even if that property is not itself contraband. *Bennis v. Michigan*, 516 U.S. 442, 452-53 (1996). Such property may be "seized pursuant to the criminal laws" because "such deprivations are not 'takings' for which the owner is entitled to compensation." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (citing *Bennis*, 516 U.S. at 452–53)).

What is more, this case involves a type of personal property (as opposed to real property) that is highly regulated. And "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Mitchell Arms, Inc. v. United States*, 26 Cl. Ct. 1, 5 (1992), *aff'd*, 7 F.3d 212 (Fed. Cir. 1993) (citing *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986)). That is because, "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a person] ought to be aware of the possibility that new regulation might even render his property

14

economically worthless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992). "This is all the more true in the case of a heavily regulated and highly contentious activity" such as ownership of particular types of firearm modifications, as "the pendulum of politics swings periodically between restriction and permission in such matters, and prudent investors understand the risk." *Holliday Amusement*, 493 F.3d at 411

Indeed, the State may not only outlaw the possession of property it determines to be dangerous, but it may also go further and physically destroy such property without just compensation because that property "is incapable of any lawful use, it is of no value, and it is a source of public danger." *Dep't of Agric. & Consumer Servs. v. Polk*, 568 So. 2d 35, 40 n.4 (Fla. 1990) (quoting *State Plant Board v. Smith*, 110 So. 2d 401, 406-07 (Fla. 1959)) (emphasis omitted); *see also State Plant Bd.*, 110 So. 2d at 407 (explaining that any "compensation in such cases is a mere bounty that may, of course, be fixed at whatever level the Legislature desires").

Plaintiff's claims fail under these principles because the statute here effects only the forfeiture of contraband—it outlaws possession of bump-fire stocks, converting them into contraband. That provision was premised on the State's police powers. *See* S.B. 7026, § 2 (legislative finding that "there is a need to comprehensively address the crisis of gun violence"). As a result, Plaintiff's claims fail: The State outlawed bump-fire stocks possession not under its eminent domain power, but under its police power. As a result, the State is not required to provide any compensation at all because no taking occurred.

## III.   THIS COURT SHOULD DISMISS COUNTS 7 AND 8 BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EQUAL PROTECTION CLAUSE.

Plaintiff asserts that § 790.222 violates the Equal Protection Clause of the Fourteenth Amendment (both facially and as-applied). He contends that the legality of a bump-fire stock under that section turns on who possesses it: "Since different people are capable of pulling a

trigger of a firearm at vastly different rates, the same conversion kit, tool, accessory or device possessed by one person would be perfectly legal, while another person in possession of the identical device would" violate the statute. Compl. ¶¶ 74, 80; *see* Compl. ¶¶ 25-26. In other words, in Plaintiff's view, whether something qualifies as a "bump fire stock" depends on whether a specific possessor of the firearm can use a modification to increase the rate of fire of a firearm to a faster rate than without modification.

Plaintiff is mistaken about how the statute operates. By the statute's own terms, whether a modification falls under the definition of "bump fire stock" does not turn on "how fast one pulls the trigger of a semiautomatic firearm." Compl. ¶ 26. Instead, whether a modification is a "bump fire stock" depends on whether it "is used to increase the rate of fire to a faster rate than is possible for a person to fire such semiautomatic firearm" without the modification. § 790.222 That is an objective test, which asks whether it is "*possible*" for "*a person*" to fire the firearm faster than it could be fired without the modification (i.e., more than one round per firing action); the test is not whether the modification allows *any particular possessor* to fire the firearm more rapidly. And as discussed below, the Court should interpret this language as prohibiting modifications that allow a firearm to fire more than one round per operation of the firing action. In other words, without modification, it is possible for a non-modified semiautomatic firearm to fire only one round per operation of the firearm's firing action, and a modification that would allow the firearm to fire more than one round per operation of the firing action is prohibited. Thus, whether a modification is a "bump fire stock" does not depend on the identity of the possessor or how quickly they can fire the firearm at issue, but instead on whether the modification allows a semiautomatic firearm to fire more than one round per operation of the firing action, whomever the user. Because the statute therefore applies to all bump-fire stock

possessors equally and without regard to any characteristic of the possessor, Plaintiff's Equal

Protection Claims fail. In any event, the statute plainly does not distinguish between any class of

persons—let alone affect any suspect class. *See Houston v. Williams*, 547 F.3d 1357, 1363 (11th

Cir. 2008) (without burden on suspect class or fundamental right, rational basis review applies).

IV.  **THIS COURT SHOULD DISMISS COUNTS 5 AND 6 BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UNDER THE SECOND AMENDMENT.**

Plaintiff next contends that § 790.222 violates the Second Amendment because, in his

view, it prohibits the possession of "[f]irearms with modifications including . . . 2-stage triggers

and short-reset triggers," which he alleges are in "common use." Compl. ¶¶ 61, 62, 67, 68; *see*

Compl. ¶¶ 27-31 (contending that the statute prohibits "trigger modifications, trigger packs,

trigger assemblies, trigger jobs, [and] multi-stage triggers"). As a result, he maintains, the statute

"imposes an impermissible burden [on his] Second Amendment rights." Compl. ¶¶ 63, 69.

Because he misreads the statute, however, Plaintiff fails to state a claim: § 790.222 does not

prohibit firearms with the trigger modifications he describes.

Like the other Courts of Appeals, the Eleventh Circuit "employ[s] a two-step inquiry

when faced with Second Amendment challenges." *United States v. Focia*, 869 F.3d 1269, 1285

(11th Cir. 2017). First, the Court must "ask if the restricted activity is protected by the Second

Amendment in the first place." *Id.* (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244,

1260 n.34 (11th Cir. 2012) (alteration in original). "If the challenged regulation does not burden

conduct within the scope of the Second Amendment as historically understood, then the law

comports with the Second Amendment." *Id.* "But if it does, then [the Court] must apply an

appropriate form of means-end scrutiny." *Id.*

Yet this Court need not engage in any part of this inquiry here because the statute does

not prohibit the modifications that Plaintiff describes. In other words, the statute does not restrict

the activity that Plaintiff contends is protected by the Second Amendment; therefore, the Court has no occasion to consider whether the Second Amendment would prevent the State from restricting that activity. To reiterate, Plaintiff's Second Amendment claim turns on *other* types of firearm modifications, *not* on the prohibition of actual bump-fire stocks. *See* Compl. ¶¶ 61, 67.

Each trigger or firearm modification that Plaintiff describes with respect to this challenge leaves unchanged the basic functionality and rate of fire (one round per operation of the firing mechanism) of a semiautomatic firearm. The operation of the mechanism that causes an unmodified semiautomatic firearm to discharge—a single pull of the trigger—results in a single round being fired. In other words, the rate of fire of an unmodified semiautomatic firearm not equipped with a bump-fire stock is one round per single operation of the mechanism (the trigger) that causes the firearm to discharge. The trigger-related modifications described by Plaintiff may increase or decrease the amount of pressure or distance that is required to depress the trigger and fire the weapon, but the modifications do not change the firearm's basic functionality or rate of fire—one must perform one operation per round fired, in this case pulling the trigger each time a round is fired. Those modifications therefore do not "alter" or "increase the rate of fire" beyond which a semiautomatic firearm can operate. As modified in the manner that the complaint describes, a semiautomatic firearm will still fire only one round per function of the trigger.

By contrast, a bump-fire stock adds *additional* functionality to the semiautomatic firearm. In addition to firing a round by pulling the trigger, a bump-fire stock allows a person to fire a round by performing a different operation: the application of constant forward pressure to the front portion of the firearm. And that functionality allows a person to fire at "a faster rate than is possible for a person to fire such semiautomatic firearm" without the device; i.e., more than one round per single operation of the mechanism that causes the firearm to discharge. By the single

operation of applying constant forward pressure to the front portion of a bump-fire stock equipped firearm, the user can fire multiple rounds, therefore increasing the rate of fire beyond what is possible without the bump-fire stock (one round per operation of the mechanism that causes the firearm to discharge). In other words, unlike the trigger modifications that the complaint describes, a bump-fire stock allows the user to discharge more than one round with a single operation of the mechanism that causes the firearm to discharge. That is what the statute prohibits; the various trigger modifications Plaintiff describes are not prohibited.

In sum, because the statute does not prohibit what Plaintiff alleges that it prohibits, this Court need not engage in a Second Amendment analysis. But even if the Complaint could fairly be construed to raise Second Amendment challenges to the statute's *actual* operation—its prohibition of bump-fire stocks—those challenges would fail. "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," "the sorts of weapons protected [are] those 'in common use'" for "lawful purposes like self-defense," and this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *District of Columbia v. Heller*, 554 U.S. 570, 624, 627 (2008) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939), and 4 Blackstone 148-49 (1769), respectively). As examples of arms that do not qualify for Second Amendment protection under this standard, the Supreme Court has identified "short-barreled shotguns," "machineguns," and "M-16 rifles and the like." *Id.* at 624, 625, 627; *see also Hollis v. Lynch*, 827 F.3d 436, 448–51 (5th Cir. 2016) (holding that under *Heller*'s "dangerousness" and "unusualness" tests, machineguns fall outside the scope of the Second Amendment); *United States v. One (1) Palmetto State Aromory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number LW001804*, 822 F.3d 136, 144 (3d Cir. 2016) (holding that "the possession of a

machine gun is not protected under the Second Amendment," and noting that "the courts are in agreement" on that proposition).

As defined by the statute, a bump-fire stock "alter[s]" a firearm's rate of fire to "mimic" that of a machinegun, or "increase[s] the rate of fire" beyond that of an unmodified firearm. If the government may, consistent with the Second Amendment, restrict "machineguns" and "the like" because of their dangerousness or unusualness, it may restrict firearm modifications that mimic the rate of fire of machineguns. Because that is what the statute does, the statute does not burden any conduct that the Second Amendment protects.

**V.  THIS COURT SHOULD DISMISS COUNTS 9 AND 10 BECAUSE PLAINTIFF FAILS TO STATE A CLAIM UNDER THE DUE PROCESS CLAUSE.**

Lastly, Plaintiff asserts that Section 790.222 violates due process because, in his view, it is unconstitutionally vague. Plaintiff argues that because the statutory definition "does not provide a definition for 'mimic automatic weapon fire,'" it "lacks language to define what is specifically prohibited to the plaintiff" and "is too vague to be understood." Compl. ¶¶ 84, 85, 87, 91, 92, 94; *see* Compl. ¶ 24.

The Eleventh Circuit has explained that courts "apply the void-for-vagueness doctrine outside of the First Amendment context only rarely." *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1277 (11th Cir. 1999). To survive a vagueness challenge, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and "provide explicit standards for those who apply them." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972))); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984) (explaining that statutes are vague if persons "of

common intelligence must necessarily guess at its meaning and differ as to its application"). Plaintiff fails to state a void-for-vagueness claim for several reasons.

*First*, Plaintiff's allegations are not specific enough to allow him to challenge the statute as void for vagueness. It has long been settled that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974); *see Catron v. City of St. Petersburg*, 658 F.3d 1260, 1271 (11th Cir. 2011) (same). Plaintiff alleges that he "owns Bump Fire Stocks." Compl. ¶ 32. Plaintiff's alleged ownership of bump-fire stocks is conduct to which Section 790.222 "clearly applies." Thus, unless he alleges some other conduct to which the statute does not clearly apply, he cannot "successfully challenge it for vagueness." *Parker*, 417 U.S. at 756.

The only other conduct that Plaintiff alleges is that he purportedly owns "other firearms that may be construed to be Bump Fire Stocks through trigger modifications and fire control group upgrades." Compl. ¶ 32. To challenge a statute as vague, though, Plaintiff must allege the specific conduct in which he is engaging so that the Court can assess whether the statute applies clearly or not. *See Leib*, 558 F.3d at 1309 (affirming dismissals of claims that were not "asserted . . . clearly enough to permit [the Court's] review"). And the Complaint does not include any allegations from which this Court could assess whether these "modifications" and "upgrades" "would be prohibited under Fla. Stat. § 790.222." Compl. ¶ 32. For example, Plaintiff does not allege whether these modifications would "mimic automatic weapon fire" or whether they are "used to increase the rate of fire to a faster rate than is possible for a person to fire such semiautomatic firearm unassisted" by that modification. § 790.222. In essence, Plaintiff alleges that he owns unspecified firearm modifications, the function of which he does not reveal,

and conclusorily states that he is unable to determine whether Section 790.222 bars his possession of those modifications.

These allegations are insufficiently specific, and this Court lacks the information to assess Plaintiff's conclusory claims. *See Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see Burdick v. Kennedy*, 700 F. App'x 984, 986 (11th Cir. 2017) ("A complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). In other words, Plaintiff alleges that he cannot discern whether the statute covers some unknown modification and that it is therefore vague. More is needed to state a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that "[f]actual allegations must be enough to raise a right to relief above the speculative level," and "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions"). Because Plaintiff fails to plausibly allege that he is engaging in any conduct to which Section 790.222 does not "clearly apply," he fails to state a void-for-vagueness claim as a matter of law. *See Leib*, 558 F.3d at 1309.

*Second*, even if this Court determines that Plaintiff did specifically allege that he is engaging in conduct to which he believes Section 790.222 does not "clearly apply," the statute is not unconstitutionally vague. Plaintiff's vagueness argument addresses only one of the two statutory definitions: whether a modification "is used to alter the rate of fire of a firearm to mimic[s] automatic weapon fire"; he does not contend that the other definition is vague. *See* Compl. ¶¶ 82-95. To qualify as a "bump-fire stock" under the challenged definition, a modification must (1) alter the rate of fire of a firearm (2) to mimic automatic weapon fire.

Plaintiff does not argue that the first requirement—altering the rate of fire of a firearm—is vague, but instead conclusorily asserts that whether the rate of fire of a weapon "mimic[s] automatic weapon fire" does not "define what is enforceable." Compl. ¶ 24.

Yet people of ordinary intelligence "have a common-sense understanding of what counts as" automatic weapon fire, and state and federal law "gives th[is] concep[t] even further content and meaning." *Leib*, 558 F.3d at 1310-11; *see Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1277 (11th Cir. 1999) (rejecting vagueness challenge where regulated individuals could "consult state law to determine" whether standard at issue was satisfied). Under both federal and state law, an automatic weapon fires more than one round per pull of the trigger, while a semiautomatic weapon fires only one round per trigger pull: As Plaintiff explains, "on a semiautomatic weapon, the rate of fire is determined by the individual pulling the trigger, since 1 round is expelled per pull of the trigger." Compl. ¶ 24; *see also* 18 U.S.C. § 921(a)(28) ("The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."). By contrast, an automatic weapon is "a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 640 n.1 (1994); *cf.* 26 U.S.C. § 5845(b) ("Machinegun—The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."); Fla. Stat. § 790.001(9) ("'Machine gun' means any firearm, as defined herein, which shoots, or is designed to shoot,

automatically more than one shot, without manually reloading, by a single function of the trigger.").

Even using a stereotypical bump-fire stock, a semiautomatic weapon fires only one round per function of the trigger; the bump-fire stock increases the frequency with which the trigger is depressed and allows multiple rounds with only one operation of the firing mechanism (forward pressure). Technically speaking, therefore, a bump-fire stock does not allow *actual* automatic weapon fire. It instead *mimics* it: With a single operation—the application of constant forward pressure on the front portion of the firearm—a bump-fire stock equipped firearm can rapidly fire multiple rounds. It is therefore easy for a person of ordinary intelligence to understand what it means to "mimic automatic weapon fire." If a single operation can result in the firing of more than one round (as a single trigger function does with an automatic weapon), then a firearm *mimics* automatic weapon fire (but is not truly automatic because the trigger is actually depressed each time a round is fired) and is covered by the statute. That is, the firearm user need only apply constant pressure to the front portion of the firearm once to fire multiple rounds, just as an automatic weapon user need only pull the trigger once to fire multiple rounds. Modifications allowing this mimicry qualify as bump-fire stocks under the statute.

In short, the definition "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding." *This That & Other Gift & Tobacco, Inc. v. Cobb County, Ga.*, 285 F.3d 1319, 1325 (11th Cir. 2002). The Eleventh Circuit has rejected similar vagueness challenges to terms with common-sense meanings. For example, in *Leib*, the court rejected a vagueness challenge to the terms "limousine" and "luxury," explaining that "[c]onsumers and travelers have a common-sense understanding of what counts." *Leib*, 558 F.3d at 1310-11. Even though those terms contained "an inherent degree of imprecision," requiring

24

"'aesthetic' judgments," the court reasoned, "the Constitution does not require precision." *Id.* at 1311 (quoting *This That & Other*, 285 F.3d at 1325). So too here. People of ordinary intelligence have a common-sense understanding of automatic weapons fire, and therefore of what it means to mimic automatic weapons fire.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's claims against the Attorney General for lack of subject-matter jurisdiction with prejudice and should dismiss Plaintiff's complaint in its entirety for failure to state a claim.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

*/s/ Edward M. Wenger*
Edward M. Wenger (FBN 85568)
CHIEF DEPUTY SOLICITOR GENERAL

Christopher J. Baum (FBN 1007882)
DEPUTY SOLICITOR GENERAL
Jordan E. Pratt (FBN 100958)
DEPUTY SOLICITOR GENERAL
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3683
(850) 410-2672 (fax)
edward.wenger@myfloridalegal.com

Diana R. Esposito (FBN 16523)
Office of the Attorney General
Suite 1100
501 E Kennedy Blvd
Tampa, FL 33602
(813) 233-2600
diana.esposito@myfloridalegal.com

*Counsel for Defendants*

25

## CERTIFICATE OF SERVICE

I certify that on this July 2, 2018, a copy of the foregoing was served on Plaintiff through CM/ECF's Notice of Electronic Filing System. Plaintiff, who is proceeding pro se, has been authorized to use the Court's CM/ECF system. *See* ECF No. 6.

/s/ *Edward M. Wenger*
Edward M. Wenger