```
1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3
            CASE NO:  8:18-CV-1062-T-33TGW
4

5  ADAM WAYNE TYLER ROBERTS,

6        Plaintiff,                    DEPOSITION OF

7  v.                                  ADAM ROBERTS

8  RICK SWEARINGEN,

9        Defendants.
   _____
10

11

12

13      TAKEN BY:        DEFENDANT HEREIN

14
        BEFORE:          JULIE K. HARVEY, RPR, FPR
15                       A-1 Court Reporting
                         P. O. Box 2005
16                       Sarasota, FL  34230

17
        DATE:            October 19, 2018
18                       Commencing at 1:04 p.m.

19
        PLACE:           A-1 Court Reporting
20                       887 62nd Street Circle
                         East
21                       Bradenton, Florida

22

23

24

25
```

```
 1

 2

 3    APPEARANCES:

 4              ADAM WAYNE TYLER ROBERTS
              3320 13th Street East
 5              Bradenton, Florida  34208
              Appearing pro se
 6              adam@bumpstocklegalaction.com

 7

 8              ALBERT J. BOWDEN, ESQUIRE
              Office of the Attorney General
 9              Special Counsel
              PL-01, The Capitol
10              Tallahassee, Florida  32399
              al.bowden@myfloridalegal.com
11              850.414.3300

12              Appearing on behalf of
              Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Deposition of:  ADAM ROBERTS

2

3                              INDEX

4

5  Examination                          Page Number

6  Direct,          by Mr. Bowden            4

7  Certificate of Oath                       105

8  Certificate of Reporter                   106

9  Witness Review Letter                     107

10  Errata Sheet                             109

11

12

13                            EXHIBITS

14  Number          Description                  Page

15  1          FL Statute 790.222...................44

16  2          Images 1 & 2 to Naples report........53

17  3          Images 3 & 4 to Naples report........55

18  4          Images 11 & 12 to Naples report......57

19  5          Images 13 & 14 to Naples report......58

20  6          Flash drive (retained by Mr. Bowden).88

21  7          Flash drive (retained by Mr. Bowden).96

22

23

24

25

```
 1                P R O C E E D I N G S
 2            THE COURT REPORTER:  Would you raise your
 3       right hand, please.
 4            THE WITNESS:  (Witness complies.)
 5            THE COURT REPORTER:  Do you swear or affirm
 6       the testimony you're about to give will be the
 7       truth, the whole truth, and nothing but the truth?
 8            THE WITNESS:  Yes, I do.
 9                 ADAM WAYNE TYLER ROBERTS,
10   after having been first duly sworn, testified as
11   follows:
12                    DIRECT EXAMINATION
13   BY MR. BOWDEN:
14       Q    Mr. Roberts, have you ever had your deposition
15   taken before?
16       A    No, I have not.
17       Q    Before we begin, I want to go over some ground
18   rules with you so you understand how the process works.
19            If you don't know what I'm asking you when I
20   ask you a question, just let me know and I will attempt
21   to rephrase the question so that you do understand that.
22       A    Okay.
23       Q    If you don't hear any of my questions, let me
24   know and I'll repeat it.
25       A    Okay.
```

1    Q    Do you hold any certifications from the NRA as

2  a firearms instructor?

3    A    I don't believe the NRA has that authority, so

4  I do not personally.  Otherwise, I would be an NRA

5  instructor right now.

6    Q    Okay.  The answer to the question, then,

7  Mr. Roberts, is you don't hold any certifications --

8    A    The answer is no.

9    Q    -- from the NRA as a firearms instructor?

10    A    The answer is no.

11         Sorry for talking over you.

12    Q    Have you held any certifications or licenses

13  from any entity that enabled you to provide firearms

14  training or instruction to others?

15    A    I'm unaware there are really authoritative --

16  I'm unaware of any authoritative licenses, so I would

17  have to say no.

18    Q    Okay.  You have never held any licenses or

19  certifications as an advanced firearms training

20  instructor; correct?

21    A    That's correct.

22    Q    Now, you've never held any licenses or

23  certifications as a tactical firearms instructor?

24    A    That's correct.

25    Q    You've never held any licenses or

1    certifications from the State of Florida as a Class K

2    firearms instructor?

3         A    To clarify, Class K is the carry permit for --

4    for what?

5         Q    It's to provide firearm instruction.

6         A    I'm unaware of this.

7         Q    Okay.  You've never held a Class K firearms --

8         A    Apparently not, no.

9         Q    -- license or certification?

10             And you've never trained individuals in the

11   use of firearms in order to qualify them to hold

12   certifications or permits for firearms?

13        A    Well, I would say I have, but not under my --

14   my license, but I assisted someone who was.  So I know

15   all the ins and outs.

16        Q    The 15 hours that you --

17        A    Roughly.

18        Q    -- provided?

19             Tell me again for whom you worked in that

20   situation.

21        A    Yes.  It was the owner of Self-Defense

22   Firearms & Hobbies.

23        Q    And was he training members of the public?

24        A    Him and the police officers that were there to

25   train, and they were training, and so the police officer

1    that was trained to teach the course.  We had no

2    disagreements whatsoever.  He understood -- we

3    understood each other implicitly.  There was no --

4         Q    Have you ever individually trained individuals

5    in the use of firearms in order to qualify them to

6    receive a certification or permit for a firearm?

7         A    No.

8         Q    Have you ever hosted any programs where you

9    gave advice to the public on the use of firearms?

10        A    I may have when I was younger.  I would teach

11   people.  You know, if they wanted to go shoot with me,

12   they were welcome to go shoot with me.  You know, it's

13   -- firearms is just a basic thing.  It's not difficult.

14        Q    Mr. Roberts, this is just asking someone,

15   perhaps an acquaintance of yours, if they wanted to go

16   shoot with you.  Is that what you're referring to?

17        A    I think at college once I stood up in class

18   and asked anybody who wanted to shoot with me, and I

19   would host this program.  I also listed it on the board,

20   the bulletin board at the college, where you have strips

21   of paper and you write your phone number on it.

22        Q    Other than standing up in class and asking

23   anyone if they wanted to shoot with you, did you ever

24   host any programs, any forums, where you made

25   presentations to members of the public about firearms

1   safety and use?

2        A    Other than what I just described and some

3   people went with me to do that, and I gave them the ins

4   and outs.

5             I also did, as part of a movie in 2010, taught

6   individuals on proper firearms use because we were using

7   modified firearms for movie props.

8        Q    How many individuals did you provide any

9   advice to there?

10       A    Six.

11       Q    How many hours of time?

12       A    It was about four or five hours.

13       Q    Anything else that you haven't mentioned where

14   you would have assisted members of the public in -- in

15   groups about firearm instruction and safety?

16       A    Nothing I can recall.

17       Q    Okay.

18       A    If I remember it, I'll definitely tell you.

19       Q    Sure.

20            Now, the affidavit that you filed in the

21   court --

22       A    Yes.

23       Q    -- said, in paragraph 2, that you were trained

24   as a gunsmith?

25       A    Yes.

```
 1        A     Three items to be tested, yes.

 2        Q     Yeah.

 3              And these are the three items that you thought

 4    you owned or possessed that were banned by the statute?

 5        A     That could be potentially banned, yes.

 6        Q     All right.  First you brought a device called

 7    a Slide Fire® stock?

 8        A     Slide Fire® stock, that's correct.

 9        Q     All right.  And that's manufactured by Slide

10    Fire® systems?

11        A     Yes.

12        Q     You purchased that in 2014?

13        A     Uh-huh.

14        Q     And --

15        A     Yes.

16        Q     -- it gets a little complicated with the name

17    of it.  We'll just call it a Slide Fire® stock.

18        A     That's perfectly fine with me.

19              MR. BOWDEN:  All right.  Okay.  Let's take a

20        look at what I'll mark as Exhibit 2 to the

21        deposition.

22              (Defendant's Exhibit 2 was marked.)

23    BY MR. BOWDEN:

24        Q     I'll ask if you can take a look at that

25    picture.  I'm referring now to the picture on the top of
```

A-1 COURT REPORTING (941) 366-6634

1   what you're holding and the picture on the bottom of

2   what was placed on the table.

3          A    That is a Slide Fire® stock.

4          Q    Okay.  And is that not the Slide Fire® stock

5   that you brought to High Noon Guns on September 20th?

6          A    That is the exact same item.

7          Q    And that was the item or device that you

8   thought might potentially have been banned by the

9   statute?

10         A    I did not think it was banned, but it had the

11  same name.  And the statute, it doesn't define that

12  stock, but it had the same name because people call

13  those things bump stocks and they also call them bump

14  fire stocks.  So I decided to bring it just to see.

15         Q    Okay.  So that Exhibit 2 fairly and accurately

16  represents the item?

17         A    Yes.

18         Q    It fairly and accurately depicts the item that

19  you brought to the High Noon Guns shop on

20  September 20th?

21         A    Yes.

22         Q    All right.  Now, you also brought to High Noon

23  Guns an AR rifle --

24         A    Yes.

25         Q    -- that had the standard stock on it that came

1    with the weapon when you bought the weapon?

2         A    I manu -- I built the weapon from parts.

3         Q    Okay.  But it was a standard stock end of the

4    weapon?

5         A    Yes, standard A-2 style stock.

6              MR. BOWDEN:  All right.  Now I'll show you

7         what I'll have marked as Exhibit 3 to the

8         deposition.

9              (Defendant's Exhibit 3 was marked.)

10             THE WITNESS:  That is the one I manufactured

11        myself.  That is not the 20-inch AR, that is the

12        10.5 inch.  And it's also registered under the

13        federal government as a short-barreled rifle.  I

14        paid a $200 tax stamp for that.

15   BY MR. BOWDEN:

16        Q    Does the rifle that's on the table and the

17   rifle -- in the picture on the top and then -- that

18   you're holding and the picture on the bottom in Exhibit

19   3, is that the weapon that you brought to High Noon

20   Guns?

21        A    Yes.

22        Q    And is that also the weapon that was used to

23   remove the standard stock and put on the Slide Fire® --

24        A    I removed the LMT --

25        Q    -- Slide Fire® stock?

1      A     I removed the LMT SOPMOD stock, and I replaced

2  it with the SSAR-15 Slide Fire® stock.

3      Q     All right.  So the -- Exhibit 3 fairly and

4  accurately depicts the AR rifle that you brought and --

5  to the High Noon Guns on September 20th?

6      A     Yes, from my memory.

7      Q     All right.  And you also brought with you to

8  High Noon Guns on September 20 a hex bolt; correct?

9      A     It was a bolt, internal hex bolt.  Some people

10 call those cheese-head bolts because of the shape of the

11 head.  It is a typical AR-15 hex screw that fits into

12 the pistol grip, and I modified it.

13     Q     I'm just seeking to get one term to use.  I

14 know you've called it a screw, I think, I think you've

15 called it a bolt, hex bolt.  Can we all agree just on

16 one terminology for the item?

17     A     It is one item of many names.  If we pick one,

18 I'll stick to it.

19     Q     All right.  Is it fair to call it a bolt?

20     A     Bolt would be confused with bolt in the

21 weapon.

22     Q     Let's call it a hex bolt.

23     A     Hex bolt sounds great.

24     Q     All right.  The second item you brought to

25 High Noon Guns on September 20th that you thought

1    potentially was banned under the statute was a hex bolt?

2         A    That's correct.

3         Q    That was a bolt that had a hole drilled

4    through the center.  And then what you did was you, in

5    effect, inserted a smaller bolt inside of that?

6         A    Threaded rod, yes.

7              MR. BOWDEN:  Threaded rod, okay.

8              And let me show you what I'll have marked as

9         Exhibit 4 to your deposition.

10             (Defendant's Exhibit 4 was marked.)

11   BY MR. BOWDEN:

12        Q    I'll ask you if you can take a look at that;

13   in particular, the picture on the top of Exhibit 4.

14        A    I recognize that.

15        Q    Does that fairly and accurately depict the hex

16   bolt that you brought to the High Noon Guns on

17   September 20th?

18        A    It does.  It's not the best picture in the

19   world, but it will suffice.

20        Q    Okay.  And, in particular, we'll talk about

21   this a little bit later, but what you did was you took

22   that hex bolt and you inserted it into the fire control

23   group portion of the rifle; correct?

24        A    Correct.  I inserted it into -- let me correct

25   you.  I inserted it into the pistol grip hole.  Right?

1   And once I tightened it up, I used the screwdriver to

2   move that threaded rod up against the trigger,

3   therefore, taking up creep and taking up trigger reset

4   time and, therefore, once that's done, it takes a lot

5   less pressure to reset that and it also takes less

6   pressure to actually pull the trigger.  When that

7   happens, it makes it faster and easier to bump fire the

8   weapon, which you can do with either a bump stock or

9   without a bump stock.

10      Q    Mr. Roberts --

11      A    I'm trying to be clear.  Sorry.

12      Q    Well, I mean, I don't want to have to repeat

13   all these questions.

14      A    No problem.

15      Q    If you'd just try to address the question, it

16   would be appreciated.

17           Okay.  And you also brought with you to High

18   Noon Guns a screwdriver; is that not correct?

19      A    An eyeglass screwdriver, yes.

20           (Defendant's Exhibit 5 was marked.)

21   BY MR. BOWDEN:

22      Q    Okay.  I'll show you what I've marked as

23   Exhibit 5 to the deposition.  In particular, I'd ask you

24   to take a look at the photograph on the bottom.

25      A    That is the screwdriver, yes.

1      Q    All right.  So that photo on the bottom also

2   fairly and accurately represents the screwdriver that

3   you brought to High Noon Guns on September 20th because

4   you believe that item might also be banned under the

5   statute?

6      A    Correct.

7      Q    All right.  Other than those three items --

8   I'll just ask this one more time.  Other than those

9   three items, you did not and do not possess yourself

10  anything else that you think might be banned under the

11  statute?

12     A    Not to my attention at that particular moment.

13  To my knowledge, we'll just say it that way.

14     Q    And that's true as of today as you sit here?

15     A    All of my bump fire stocks or what I consider

16  to be a bump fire stock is outside the State of Florida.

17     Q    Okay.  Let's talk about that one at a time, if

18  we can.

19          First, as to the Slide Fire® stock, what did

20  you do with that item?

21     A    It was mailed out.

22     Q    Mailed to whom?

23     A    I'd rather not give his name, if that's okay.

24     Q    Where does that person reside?

25     A    Texas.

1      Q    Is he a friend of yours?

2      A    Yes.

3      Q    And do you have an agreement with that

4    individual that he will mail it back to you if, as a

5    result of your lawsuit, the statute is declared

6    unconstitutional?

7      A    It may not be possible.  Due to the federal

8    regulations on bump stocks, it may have to be destroyed.

9      Q    Assuming there are no federal regulations

10   which would prohibit him to send it back to you, and

11   assuming you're successful in this lawsuit, do you have

12   an arrangement with that fellow that he'll send it back

13   to you, if you want it?

14     A    I'm sure he could, yes.

15     Q    I mean, that's the understanding you have.  If

16   you want it back, he'll send it back to you?

17     A    In the meantime, though, it would --

18     Q    I'm sorry, is that a yes?

19     A    Yes.

20     Q    Okay.  All right.  So, in your complaint, on

21   paragraph 21 you said there was no legal way to get rid

22   of a bump fire stock in Florida other than to destroy

23   it.  And just for clarification, you didn't destroy that

24   Slide Fire® systems device?

25     A    No.  The law wasn't enacted back then.

1      Q      Mr. --

2      A      I want to answer this, though.

3             The law wasn't enacted back then.

4      Q      Answer the question and then you can explain

5      after you answer the question, but first if you'd

6      address the question.

7      A      All right.

8      Q      The question was -- and I'll see if --

9      A      We'll start over again.

10     Q      In your complaint, on paragraph 21, you stated

11     that there was no legal way to get rid of a bump fire

12     stock in Florida other than to destroy it.  So,

13     obviously, if you sent it to an individual in Texas with

14     the agreement that if you wanted it back some day, he'd

15     send it back to you, you didn't destroy it; correct?

16     A      That is correct.

17            I'd like to add, though, what I was referring

18     to is once the law is enacted.  So right now there is no

19     legal way to get rid of a bump fire stock other than to

20     destroy it.  That's what I was saying.  So at the

21     current moment there is no way.

22     Q      What did you do with the hex bolt?

23     A      It is gone.  It is mailed to Texas.

24     Q      Did you mail it to the same individual --

25     A      Yes.

```
 1      Q    -- that you mailed the -- you have to wait

 2  until I'm done.

 3      A    Go ahead.

 4      Q    Did you mail it to the same individual you

 5  mailed the Slide Fire Solutions device?

 6      A    Yes.

 7      Q    All right.  And did you simply have an

 8  agreement with that fellow that if you want that hex

 9  bolt back, he'll send it back to you?

10      A    I think I told him to keep it because they are

11  simple to make.

12      Q    All right.  Finally, we'll talk about the

13  third item that you brought to the gun range on

14  September 20th, which was that screwdriver.  What did

15  you do with the screwdriver?

16      A    It is mailed out of the state.

17      Q    Did you mail it to the same fellow in Texas

18  you mailed the hex bolt and the Slide Fire Solutions®

19  item?

20      A    Yes.

21      Q    All right.  Did you have an agreement with

22  that fellow that if you want that screwdriver back he'll

23  send it back to you?

24      A    Never had an agreement.  But if I wanted it

25  back, I suppose I could ask for it.
```

1      Q     And do you suppose he'd send it back to you?

2      A     Yes.

3      Q     All right.  This is a good friend of yours?

4      A     I know him.  Acquaintance.

5      Q     I understand.

6            Okay.  Let's talk about the Slide Fire

7      Solutions® device and the mechanics of what happens.

8      You replace the -- the end of the rifle, the stock end

9      of the rifle, and the trigger handle with the Slide Fire

10     Solutions® device; correct?

11     A     The pistol grip and the stock is replaced with

12     a Slide Fire® device.

13     Q     All right.  Pistol grip and the stock.

14           And when you insert the Slide Fire Solutions®

15     device, the way you would initiate the firing of the

16     weapon is to pull forward on the weapon, right, you'd

17     apply pressure forward -- if you're a right-handed

18     shooter, you're applying pressure forward with your left

19     hand; correct?

20     A     Correct.

21     Q     All right.  And what that does, then, is it

22     causes the Slide Fire Solutions® device to hit your

23     finger as you're pulling it forward, pulling the weapon

24     forward; correct?

25     A     Incorrect.  The trigger hits your finger, it

1    bounces back.

2         Q    Okay.  The trigger hits your finger?

3         A    That's right.  Or your finger hits the

4    trigger, either which way you want to say it.  Glass

5    half full or half empty.  It doesn't matter.

6         Q    Yeah.

7              And you're not extending your finger, you're

8    not flexing your finger, you're just holding your finger

9    there and the trigger, then, when you're applying that

10   forward pressure, the trigger hits your finger?

11        A    Correct, with or without a bump stock.

12        Q    Well, we're talking about the addition of the

13   bump stock now.

14        A    Okay.

15        Q    You may have your own thoughts and feelings

16   about what happens otherwise.  We're talking about the

17   addition of the Slide Fire Solutions® device.

18        A    Go ahead.

19        Q    If you'd just address my questions, I'd

20   appreciate it.

21        A    I'm just clarifying.

22        Q    When you had the Slide Fire Solutions® device

23   on the weapon, you apply pressure forward, that causes

24   the trigger to hit your finger, your stationary finger,

25   and the weapon discharges; correct?

1        A    That's correct.

2        Q    All right.  Then, after it discharges, it

3   recoils, and after the recoil, it bounces back forward;

4   correct?

5        A    Forward pressure on your hand pulls it

6   forward.  That's what's happening.  So I would say

7   that's incorrect.

8        Q    All right.  So forward -- the continued

9   forward pressure on the weapon pulls the device forward

10  and it -- again, the trigger hits your finger and

11  discharges again?

12       A    Correct.

13       Q    And that cycle that you initiated with one

14  forward pressure and the discharge of the gun, that

15  continues over and over and over again.  And if you're

16  doing it correctly and you're holding that forward

17  pressure out, it would actually continue to discharge

18  until there's no more ammo in the weapon?

19       A    Sometimes.

20       Q    Again, if you're doing it where you're

21  continuing to hold that forward pressure out there?

22       A    Sometimes.

23       Q    You say "sometimes."

24       A    Sometimes you get lucky, sometimes it hiccups,

25  sometimes it stops, as we saw in -- the day we were out

1    there.  Your expert wasn't able to fire it in long

2    bursts.  There's a reason why.

3         Q    Initially.  Initially.

4         A    Even afterward.

5         Q    So would you agree with me that the forward

6    pressure that you assert on that weapon with your left

7    hand with the Slide Fire Solutions® device installed on

8    it, that's -- that's one operation?  You're extending

9    your left hand forward, and you're applying pressure on

10   the weapon?

11        A    Pulling forward doesn't fire the weapon,

12   though.  And I know what you're getting at.  But, no.

13        Q    Well, isn't it true that you initiate one

14   action or one operation with that Slide Fire Solutions®

15   device on the weapon and you're getting more than one

16   bullet for that one operation?

17        A    Incorrect.  The Slide Fire® has absolutely

18   nothing to do with the firing of the weapon.  The firing

19   of the weapon is done with the weapon and the trigger.

20   If you take the Slide Fire® off, you can do the exact

21   same thing.

22        Q    That's not -- Mr. Roberts, I'm not going to be

23   asking you right now at this point --

24        A    I'm clarifying.

25        Q    -- what you can do with the item off.

1      A     I understand.

2      Q     I'm going to show you your video, and I'm

3  going to ask you to explain to me how you can do that.

4  If you would just please answer the questions that I'm

5  asking you about the Slide Fire Solutions® device on the

6  weapon.

7      A     Okay.  I answered the question.  That was

8  incorrect.

9      Q     You'll have plenty of time later on to explain

10  how you think you can bump fire without any Slide Fire

11  Solutions® device on the weapon.  We'll go through that

12  later, and you can explain that.

13      A     Understood.  Move forward.

14      Q     Confine your answers, please, to this portion

15  of the exam that relates to the addition of the Slide

16  Fire Solutions® device on the weapon.

17      A     Repeat the question and I'll answer.

18      Q     Isn't it true that when you have the Slide

19  Fire Solutions® device on the weapon, you have

20  initiation of one action and, in response, you have many

21  bullets coming out of the weapon?

22      A     Incorrect.

23      Q     Is it your position -- what is -- what is your

24  position with regard to how you would get many bullets

25  to leave the weapon?  How many actions do you have to

1  take?

2      A    Are you referring to a semiautomatic weapon

3  with a Slide Fire® stock or are you referring to a

4  machine gun?

5      Q    When -- okay.  Let's talk about the weapon

6  that you brought to High Noon Guns on September 20th.

7  Isn't it true that with that AR rifle, when you install

8  the Slide Fire Solutions® device, and Mr. Naples, not

9  initially, but after awhile when he understood how to

10  utilize the device, he initiated one operation, which

11  was the forward pressure with his left hand and, in

12  response, many bullets came out of the weapon?

13      A    Incorrect.

14      Q    That's not what you saw when you were standing

15  there?

16      A    No, I did not.

17      Q    What did you see when he applied -- this is

18  now not in the very beginning when he was unsure of how

19  to use the device, but this was once he attempted to use

20  it a few times and got the -- an understanding of how to

21  use the device.  What did he need to do -- what actions

22  did he need to take to get multiple bullets coming out

23  of the weapon?

24      A    He needed to pull the trigger each time, and

25  that is exactly what happened.

1      Q     You saw him flexing or extending his finger

2   pulling the trigger --

3      A     Not required.

4      Q     -- with the Slide Fire Solutions® device on

5   the weapon?

6      A     It was not required.  But as every

7   semiautomatic weapon, including --

8      Q     Mr. Roberts --

9      A     I need to answer this question clearly.

10      Q     Did you see him flexing or extending -- or

11   extending his finger more -- okay.  Back up for a

12   second.

13      A     Sure.

14      Q     When Mr. Naples had the Slide Fire Solutions®

15   device on the AR weapon and he applied the forward

16   pressure with his left hand, did you see him flexing or

17   extending his trigger finger at all?

18      A     No.

19      Q     Okay.  When multiple bullets came out of the

20   AR weapon, did you see him at any point needing to flex

21   or extend his finger?

22      A     No.

23      Q     Isn't it true, then, that what happened was,

24   once Mr. Naples got the hang of how to use the Slide

25   Fire Solutions® device, he applied forward pressure with

1    his left hand, which caused the trigger to brush his

2    stationary trigger finger and then shoot multiple

3    bullets out of the weapon?

4         A    No.  That's not what I saw.

5         Q    What did you see?

6         A    I saw the trigger being pulled for every round

7    fired, and it requires a pull of the trigger.  Whether

8    the trigger finger is stationary or whether the trigger

9    finger is moving, it is immaterial.  That is what a

10   semiautomatic weapon is defined as by ATF.  It shoots --

11   designed to shoot one round per pull of the trigger.

12   That's the definition.

13        Q    You never saw when Mr. Naples -- let's review

14   this.  When you saw Mr. Naples using the Slide Fire

15   Solutions® device and was shooting many bullets, not

16   just one, but many bullets out of the weapon, you did

17   not see him flex or extend his trigger finger at all?

18        A    Define extend.  Do you mean extend by moving

19   your index finger straight forward --

20        Q    Forward.

21        A    -- or do you mean extending by holding it

22   stationary?

23        Q    Forward.  Moving it forward.

24        A    It was not moved forward.  That's not how you

25   fire a weapon anyway.

```
 1        Q    Okay.  From what you saw, isn't it true that

 2   Mr. Naples' finger, his trigger finger, was stationary?

 3        A    Yes.

 4        Q    And the device, by bumping backwards and

 5   forwards, was brushing his stationary trigger finger;

 6   correct?

 7        A    The device?

 8        Q    Yeah, the Slide Fire Solutions®.

 9        A    Slide Fire® had nothing to do with it.

10        Q    The Slide Fire Solutions® device, which was

11   causing the weapon to bump forward after it recoiled

12   backwards --

13        A    Incorrect.

14        Q    -- was causing the trigger to brush his

15   stationary trigger finger?

16        A    Incorrect.

17        Q    Then you explain how you understand it

18   happened.

19        A    Slide Fire® stock is a comfort device.  It's

20   to be comfortable.

21        Q    Well -- okay.

22        A    Let me explain.

23        Q    I'm not asking for the dynamics.

24        A    I am.  This is where we're getting to.  This

25   is the meat and potatoes right here, man.
```

1      Q     By expressing it's a comfort device, which,

2   again, is your position, I understand --

3      A     It plays no part in bump firing.

4      Q     I'm asking you for the mechanics of what

5   occurred.

6      A     That's what I'm doing.

7      Q     Then just address the mechanics then.

8      A     All right.  Are you ready?

9      Q     Go right ahead.

10     A     His trigger finger is staying stationary while

11  the trigger is impacting his finger.

12     Q     His stationary finger?

13     A     His stationary finger.

14     Q     All right.

15     A     That is immaterial of a bump fire stock being

16  installed.

17     Q     I'm not asking you for the editorial at the

18  end of that, I'm just asking you to describe

19  mechanically what you saw, and you just described it.

20           How many operations -- strike that.  Let me

21  rephrase that.

22           Isn't it true that the only operation of the

23  weapon to discharge multiple bullets was the initial

24  operation of Mr. Naples extending his left hand forward

25  and at that point, after the weapon discharged, it was,

1    in effect, on automatic --

2         A    No.

3         Q    -- in that he never took any subsequent

4    actions, he simply maintained the forward pressure with

5    his left hand and allowed the trigger to keep brushing

6    back and forward on his right hand?

7         A    I didn't see it that way.

8         Q    Explain how you saw it.

9         A    I saw one finger -- I saw the trigger being

10   pulled every single time a round was fired.  That's what

11   I saw.

12        Q    You saw the trigger being pulled?

13        A    For every round that was fired.

14        Q    By that do you mean you saw Mr. Naples

15   initiating action with his trigger finger to either flex

16   or extend his trigger finger in order to get more than

17   one bullet out of the gun?

18        A    It's not required.  And there is no more than

19   one bullet being pulled for every round fired.

20        Q    And the reason why Mr. Naples was not required

21   to either flex or extend his right finger was that once

22   the gun discharged, it caused the rebound effect to

23   brush his stationary finger, which then continued to

24   discharge the weapon; correct?

25        A    It's multiple operations.  But, yes.

1    altered in any way, you have one action of your finger,

2    which is usually pulling the trigger --

3          A    Uh-huh.

4          Q    -- that results in one bullet leaving the gun;

5    correct?

6          A    Correct.

7          Q    All right.  So each time you want another

8    bullet to leave the gun, you need to activate your

9    trigger finger, like, flex your finger in order to pull

10   the trigger; correct?

11         A    It's not necessary.

12         Q    With a semiautomatic weapon?

13         A    Correct.

14         Q    Well, isn't there a one-to-one relationship?

15   In other words, you pull the trigger, a bullet comes

16   out.  Not -- now, I'm not referring to what you think

17   can be done with what I saw in the video.  In the

18   typical situation, in a typical situation, isn't it true

19   that with a semiautomatic weapon, there's a one-to-one

20   relationship, which means a trigger pull equals one

21   bullet; you want another bullet to come out of the

22   weapon, you need to pull the trigger again?

23         A    The trigger needs to be activated.

24         Q    Okay.  And by "activated," you mean pull the

25   trigger?

1    A    Pressed and moved, yes.

2    Q    Right.

3         Okay.  Activate -- one activation, in the

4    overwhelming number of instances, when you activate the

5    trigger once, you get one bullet?

6    A    Yes.

7    Q    All right.  You want to get another bullet out

8    of the gun, you have to activate the trigger a second

9    time?

10    A    Correct.

11    Q    And, again, in the overwhelming number of

12    instances, that means pulling the trigger?

13    A    Correct.

14    Q    All right.  However, on the other hand, with

15    an automatic weapon, that's a little different.  When

16    you activate by pulling the trigger, you get more than

17    one bullet; correct?

18    A    Fully automatic, correct.

19    Q    All right.  So one action of the finger in a

20    fully automatic weapon results in more than one bullet;

21    true?

22    A    Correct.

23    Q    All right.  Now, the bolt, the hex bolt, that

24    you produced that was inserted into the rifle, in the

25    overwhelming number of ordinary circumstances, that

1   still resulted in a situation where you would pull the

2   trigger and get one bullet out of the weapon?

3        A    Correct.

4        Q    And if you wanted another bullet,

5   notwithstanding the fact that that hex bolt was in

6   there, if you wanted another bullet, you had to pull the

7   trigger again?

8        A    Correct.

9        Q    So there's -- again, there's a one-to-one

10  relationship; one pull of the trigger equals one bullet?

11       A    Correct.

12       Q    Another pull of the trigger, you get another

13  bullet?

14       A    A pull and release of the trigger, correct.

15       Q    All right.  That -- that hex bolt, in ordinary

16  circumstances when you inserted that into the weapon, it

17  didn't turn that weapon into an automatic weapon?

18       A    That's true.

19       Q    All right.  Didn't convert it from a

20  semiautomatic to an automatic?

21       A    Correct.

22       Q    Okay.  Now, you referred to a number of things

23  in the complaint that apparently you didn't have and

24  bring to the gun range.  So, for example, in the

25  complaint you referred to a two-stage or multistage

1   trigger; correct?

2       A    Correct.

3       Q    But you don't and didn't own a two-stage or

4   multistage trigger and didn't bring that to the gun

5   range?

6       A    Correct.

7       Q    However, even with a two-stage or a multistage

8   trigger, the operation of the weapon is such that you

9   get one bullet come out for one operation of the

10  trigger?

11      A    Correct.

12      Q    And it doesn't allow a firearm to discharge

13  more than one bullet for one operation of the trigger?

14      A    Correct.

15      Q    You also referred in the complaint to a short

16  reset trigger?

17      A    Yes.

18      Q    And you don't have -- didn't have and didn't

19  bring to the gun range a short reset trigger?

20      A    The hex bolt acted as a short reset.

21      Q    Okay.  But there are -- you can create a short

22  reset trigger in other ways as well?

23      A    Yes.

24      Q    All right.  And in all those other ways that

25  you could create a short reset trigger, other than

1    installation of a hex bolt, the same thing applies?

2         A    Correct.

3         Q    That means one operation of the trigger equals

4    one bullet?

5         A    Correct.

6         Q    And it doesn't allow a firearm, and the

7    semiautomatic firearm, to discharge more than one bullet

8    per one trigger pull?

9         A    That's correct.

10         Q    Okay.  And you also referred in the complaint

11    to an adjustable trigger, and you did not have -- don't

12    have and didn't bring to the gun range on September 20th

13    an adjustable trigger?

14         A    The hex bolt acted as an adjustable trigger.

15         Q    Okay.  Other than the installation of the hex

16    bolt, which then affected the trigger to, in effect, act

17    as an adjustable trigger, there are other ways to create

18    an adjustable trigger?

19         A    Yes.

20         Q    All right.  So referring now to all those

21    other ways you can create an adjustable trigger --

22         A    Correct.

23         Q    -- the operation of the weapon is similar as

24    we had talked about with the short reset trigger and the

25    two-stage or multistage trigger, which is that you get

1    one bullet per one operation of the trigger?

2        A    Correct.

3        Q    And it does not allow the firearm to discharge

4    more than one bullet per trigger pull?

5        A    That's correct.

6        Q    Okay.  Now, you referred in the complaint to a

7    trigger assembly or a trigger pack?

8        A    Yes.

9        Q    You didn't have with you at the gun range on

10   September 20 a trigger assembly or a trigger pack.  But

11   what a trigger assembly or trigger pack is, isn't that

12   just simply the collection of parts that comprise the

13   trigger?

14       A    Some weapons have a trigger pack rather than

15   installed parts.  The MP5, for example, has a trigger

16   pack.  My MP5 has a trigger pack rather than a separate

17   hammer, trigger, disconnect all housed in the receiver.

18       Q    The trigger assembly is simply a term that

19   refers to that portion of the gun that has the trigger

20   and components surrounding the trigger?

21       A    A Geissele trigger, for example --

22       Q    Is that a yes or no?

23       A    Repeat the question again.

24            MR. BOWDEN:  Okay.  Could you read the

25       question?  The trigger and the surrounding

34

```
 1        components.
 2              (The court reporter read the pending
 3        question.)
 4              THE WITNESS:  It could be construed, but it
 5        wasn't what I was referring to in the complaint.
 6   BY MR. BOWDEN:
 7        Q    Okay.  Well, when you're referring to the
 8   trigger pack in the complaint, explain what you were
 9   referring to.
10        A    A trigger pack is what is commonly used on G3,
11   MP5, HK33 style weapons, and it is a collection of
12   components that are to fire the weapon.
13        Q    Okay.
14        A    And that's -- some include sears, which are
15   not included in the AR-15.
16        Q    Well, it's not a part, it's not a device, it's
17   just the collection of the components within the gun;
18   you refer to that as the trigger pack; is that correct?
19        A    It could be a tool.
20        Q    A trigger pack?
21        A    Could be a tool.  Tool doesn't necessarily
22   just have one part.
23        Q    All right.  Well, isn't the trigger assembly
24   nothing more than the collection of -- of the components
25   of the gun?  It's not a part or a device?
```

1     A     It's a conversion kit.

2     Q     Oh, okay.

3           All right.  Well --

4     A     The law is badly worded.

5     Q     Whether you have a trigger assembly or whether

6  you have a trigger pack on a semiautomatic weapon, that

7  -- having that with the weapon, isn't it true that that

8  does not alter the one-to-one relationship of needing to

9  pull the trigger once to get one bullet?

10    A     That's correct.

11    Q     And to get another bullet you need to pull the

12 trigger again?

13    A     Trigger needs to be activated.

14    Q     And you need to activate or pull the trigger a

15 second time to get a second bullet?

16    A     Correct.

17    Q     All right.  Finally, in the complaint you

18 referred to a fire control group.  Again, that's not

19 a -- the fire control group itself is not a device or an

20 item, it's instead a collection of the parts?  It's the

21 part of the gun that you might think of where it

22 controls the trigger's operation.  It's a collection of

23 parts, basically; right?

24    A     It consists of the hammer, trigger,

25 disconnect, and springs and pins.  On a fully automatic

1   weapon, that includes auto sear.

2       Q    Okay.  All right.  Why don't we do this now.

3   We're going to watch the video that the videographer

4   made that I'm going to give you.

5       A    Okay.

6       Q    And if we were standing around, I don't know,

7   taking a break and doing all sorts of things that didn't

8   relate to shooting guns and taking parts on and off, as

9   you may notice, he was stopping and starting his camera.

10  So the video does not contain us standing around and

11  walking out to take a break.

12      A    Mine does.

13      Q    Okay.  But his doesn't.  So it's simply the

14  meat.  It's an accumulation of all the different

15  sequences of what we did at the --

16      A    Okay.

17      Q    -- High Noon Guns gun range.

18      A    Okay.

19      Q    What I want to do is watch that with you.

20      A    Absolutely.

21      Q    I'm going to ask you to verify that that was

22  you, that was me, that was Mr. Naples, and that that

23  video is, in fact, fairly representative of us on that

24  day there.

25      A    That's what happened.

```
 1       Q    I may ask you some other questions after you

 2   watch it, too, as well.

 3       A    Sure.

 4            MR. BOWDEN:  Okay.  Let's go off the record.

 5            (There was a brief off-the-record discussion,

 6       after which the following proceedings were had:)

 7            MR. BOWDEN:  We're going to mark that video.

 8            THE WITNESS:  I am going to give you some

 9       URLs, by the way, before we leave.  I didn't know

10       it would be this long.  So I have my laptop.  I'm

11       going to send it to you via email anyway.  I just

12       want to make sure you get the stuff before it's

13       time to go.

14            MR. BOWDEN:  All right.

15   BY MR. BOWDEN:

16       Q    Mr. Roberts, you just watched the video of our

17   appearance at High Noon Guns on September 20th, 2018,

18   and I'm marking that now, that video, as Defendant's

19   Exhibit 6.

20            After having watched that video, does it

21   fairly and accurately represent all the activities on

22   September 20th at High Noon Guns?

23       A    Yes.

24       Q    In particular, does it fairly and accurately

25   represent the devices and the items that you brought to
```

1  High Noon Guns, that being the Slide Fire® item, the hex

2  bolt, and the screwdriver?

3      A    They were --

4      Q    What I'm asking you is:  Is that what you

5  brought and does the video fairly and accurately

6  represent it?

7      A    Those are the proper devices that were brought

8  there.

9      Q    I'm not asking -- in effect, I'm not asking

10  you anything other than did I misrepresent something

11  when I put the video together?

12      A    No, nothing was misrepresented at all.

13      Q    All right.

14      A    The expert may have, but ....

15      Q    As the items that were depicted there that you

16  brought --

17      A    Yes, the items are fine.

18      Q    -- that fairly and accurately --

19      A    I do have an issue with the expert, obviously.

20      Q    -- represents that.

21          (Defendant's Exhibit 6 was marked and retained

22  by Mr. Bowden.)

23  BY MR. BOWDEN:

24      Q    Okay.  All right.  Quickly, in terms of what

25  you saw and what we did, first what Mr. Naples did was

1  he fired your AR rifle with the original butt stock and

2  pistol grip on it; correct?

3          A     Correct.

4          Q     And every time he pulled the trigger, he

5  discharged a single round?

6          A     Correct.

7          Q     And to discharge multiple rounds, he had to

8  pull and release the trigger multiple times?

9          A     Correct.

10         Q     So with the stock -- original butt stock and

11 pistol grip that you had on it, it did not discharge

12 more than one round per single operation of the trigger?

13         A     Correct.

14         Q     All right.  Then the second thing that

15 happened was Mr. Naples removed the butt stock and

16 pistol grip that you had on there and installed the

17 Slide Fire Solutions® device, which we're all referring

18 to as the bump fire stock device; correct?

19         A     Correct.

20         Q     All right.  Then what he did at that point to

21 fire the weapon was he pushed -- he used his left hand

22 to push the front portion of the rifle forward; correct?

23         A     Okay.  Correct.  I believe it was his left

24 hand.  He is right-handed.

25         Q     And then, after applying that forward pressure

1    to the front part of the firearm, that caused the

2    trigger to come in contact?

3         A    Correction.  I believe it was his right hand

4    that was pulled forward.

5         Q    Well, he pulled the weapon forward with his

6    left hand; right?  He applied --

7         A    That's correct, yes.

8         Q    Okay.

9         A    I used to own two of those, and one was

10   left-handed, the other was right-handed.  My apologies.

11        Q    And when he applied that pressure pushing

12   forward with his left hand, it caused the trigger to

13   come in contact with the trigger finger --

14        A    Yes.

15        Q    -- thereby discharging the firearm?

16        A    Yes.

17        Q    And he stood there continuously applying

18   forward pressure with his left hand and the recoil, in

19   addition to that forward pressure, caused the rifle to

20   rapidly and repeatedly rock or bump back and forth;

21   correct?

22        A    Repeat that again.

23             (The court reporter read back the pending

24   question.)

25             THE WITNESS:  I believe that is correct.

1    BY MR. BOWDEN:

2        Q    Okay.  Thereby resulting in the discharge of

3    multiple rounds?

4        A    I'd like to say one round per trigger pull,

5    just to clarify.  But, yes.

6        Q    Well, there was -- again, just to repeat, I

7    think the basics of the operation of what I'm trying to

8    establish, he took, himself -- he physically took one

9    affirmative action, which is to push forward, and after

10   that, with the bump fire solution device on it, he took

11   no other affirmative actions, he just stood there and

12   held the weapon?

13       A    I can't say that's correct because the trigger

14   has to be pulled and activated.

15       Q    But the trigger was not pulled due to any

16   action by him?

17       A    It was.  It was pulled by his actions for

18   sure.

19       Q    Did you -- again, I don't want to repeat the

20   questions I have before.  Did you see him flexing his

21   finger?

22       A    His finger was not flexed, it was held

23   stationary.

24       Q    All right.  Okay.  And after continuously

25   applying that forward pressure, I think once he got the

1    hang of it, the -- the rifle fired all the rounds and

2    only stopped when the magazine was empty; correct?

3        A    Correct.

4        Q    Okay.  Then we switched on to the weapon that

5    had the -- the hex bolt, and the first thing that we did

6    was we removed the original hex bolt that attached the

7    pistol grip and replaced it with the hex bolt that you

8    had modified; correct?

9        A    Correct.

10       Q    And then we fired the weapon with the hex --

11       A    I'd like to make a correction.  Sorry.  The

12   modified hex bolt was already installed into the

13   weapon --

14       Q    Okay.

15       A    -- and we fired it that way first.  And then

16   afterward we took that hex bolt out and replaced it with

17   a standard hex bolt.

18       Q    I understand.  Let me go back.

19       A    Sure.

20       Q    So once we used the weapon that had the hex

21   bolt in it, we fired the weapon with the modified hex

22   bolt that you had installed into the weapon, that's the

23   first thing that Mr. Naples did; right?

24       A    Uh-huh.

25       Q    Correct?

1      A      I'm sorry.  You've got to repeat that again.

2      Q      Okay.  All right.  After we put the weapon

3   away that had the Slide Fire Solutions® device on it --

4      A      Okay.

5      Q      -- we were done with that testing --

6      A      The M4A1.

7      Q      Correct.

8              -- we then moved on to the rifle that had in

9   it the modified hex bolt?

10     A      Correct.

11     Q      And Mr. Naples loaded that weapon, and he

12  fired it with the modified hex bolt in the weapon?

13     A      Correct.

14     Q      And what we saw there was that when he fired

15  it, he had to pull the trigger every time he wanted one

16  bullet to come out?

17     A      Correct.

18     Q      We removed the modified hex bolt then and then

19  installed the original unmodified hex bolt.  Mr. Naples

20  loaded the weapon and again fired it, but we saw the

21  same thing, which was that he had to pull the trigger

22  each time he wanted one bullet to come out?

23     A      Correct.

24     Q      So it was one trigger pull for one bullet.  He

25  had to pull the trigger again for another bullet.  That

1    was the situation with that weapon whether it had the

2    modified hex bolt in it or didn't have the modified hex

3    bolt in it; correct?

4         A    Correct.

5         Q    Sorry?

6         A    Correct.

7         Q    All right.

8         A    The difference between both the modified and

9    unmodified hex bolt without regards to -- the difference

10   between the modified and unmodified bolt, that one round

11   is fired per trigger pull.

12        Q    All right.  And the only difference, the only

13   change with the modified hex bolt was that the -- the

14   reset distance of the trigger, that is the amount that

15   the trigger would move after having been pulled, was

16   reduced?

17        A    Creep was also eliminated.

18        Q    Okay.  And -- and, just for the record, in

19   case the judge doesn't know what creep is, would you

20   explain what creep is?

21        A    Creep is the amount of distance the trigger

22   moves before the trigger breaks.  By "trigger breaks," I

23   mean by activation of either the sear or tripping off

24   the disconnect firing the hammer -- or releasing the

25   hammer to fire the weapon.  Sorry.

# Exhibits 2-5 from October 19, 2018

# Deposition of Plaintiff

## ATTACHMENT TO THE EXPERT REPORT OF JOSEPH CHARLES NAPLES – IMAGES



*Image 1*



*Image 2*

8





*Image 3*



*Image 4*



EXHIBIT
3
JM   10-19-18
A. Roberts



Image 11



Image 12





Image 13



Image 14

14



EXHIBIT
5
10-19-18
A. Roberts