# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


CASE NO:  8:18-CV-1062-T-33TGW


ADAM WAYNE TYLER ROBERTS,

          Plaintiff,                **DEPOSITION OF**

v.                                  **ADAM ROBERTS**

RICK SWEARINGEN,

          Defendants.

_____


          TAKEN BY:          DEFENDANT HEREIN


          BEFORE:            JULIE K. HARVEY, RPR, FPR
                             A-1 Court Reporting
                             P. O. Box 2005
                             Sarasota, FL  34230


          DATE:              October 19, 2018
                             Commencing at 1:04 p.m.


          PLACE:             A-1 Court Reporting
                             887 62nd Street Circle
                             East
                             Bradenton, Florida

```
 1

 2

 3    APPEARANCES:

 4            ADAM WAYNE TYLER ROBERTS
              3320 13th Street East
 5            Bradenton, Florida  34208
              Appearing pro se
 6            adam@bumpstocklegalaction.com

 7

 8            ALBERT J. BOWDEN, ESQUIRE
              Office of the Attorney General
 9            Special Counsel
              PL-01, The Capitol
10            Tallahassee, Florida  32399
              al.bowden@myfloridalegal.com
11            850.414.3300

12            Appearing on behalf of
              Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of:  ADAM ROBERTS

INDEX

| Examination | Page Number |
|---|---|
| Direct,          by Mr. Bowden | 4 |
| Certificate of Oath | 105 |
| Certificate of Reporter | 106 |
| Witness Review Letter | 107 |
| Errata Sheet | 109 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | FL Statute 790.222................... | 44 |
| 2 | Images 1 & 2 to Naples report........ | 53 |
| 3 | Images 3 & 4 to Naples report........ | 55 |
| 4 | Images 11 & 12 to Naples report...... | 57 |
| 5 | Images 13 & 14 to Naples report...... | 58 |
| 6 | Flash drive (retained by Mr. Bowden). | 88 |
| 7 | Flash drive (retained by Mr. Bowden). | 96 |

```
 1                P R O C E E D I N G S
 2            THE COURT REPORTER:  Would you raise your
 3        right hand, please.
 4            THE WITNESS:  (Witness complies.)
 5            THE COURT REPORTER:  Do you swear or affirm
 6        the testimony you're about to give will be the
 7        truth, the whole truth, and nothing but the truth?
 8            THE WITNESS:  Yes, I do.
 9                ADAM WAYNE TYLER ROBERTS,
10    after having been first duly sworn, testified as
11    follows:
12                    DIRECT EXAMINATION
13    BY MR. BOWDEN:
14        Q    Mr. Roberts, have you ever had your deposition
15    taken before?
16        A    No, I have not.
17        Q    Before we begin, I want to go over some ground
18    rules with you so you understand how the process works.
19            If you don't know what I'm asking you when I
20    ask you a question, just let me know and I will attempt
21    to rephrase the question so that you do understand that.
22        A    Okay.
23        Q    If you don't hear any of my questions, let me
24    know and I'll repeat it.
25        A    Okay.
```

A-1 COURT REPORTING (941) 366-6634

```
 1        Q     You need to give audible answers.  By that I
 2   mean you can't nod your head up and down or shake your
 3   head side to side.  You can't wave your hand.  Even
 4   maybe, perhaps, later on, if there's anything you're
 5   going to demonstrate to me, you can't say something
 6   like, "See, I'm going like this," because we don't know
 7   on the record what that means.  So let's all do, me
 8   included, the best job we can to try to audibly state
 9   what it is we're trying to say when we're answering
10   questions.
11        A     Understood.
12        Q     All right.  You need to wait until I'm done
13   asking a question before you give me an answer because
14   the court reporter does not do very well when you're
15   talking and I'm talking at the same time.
16        A     Okay.
17        Q     And I'll do the best I can to wait until
18   you're done with an answer before I ask you the next
19   question.
20              You need to do the best job you can to answer
21   the question that I'm asking and only the question that
22   I'm asking, not what you think I'm asking.  All right?
23              So, in other words, do your best to narrowly
24   address what it is I'm really asking about.  Do you
25   understand that?
```

1        A    Yes, I do.

2        Q    Okay.  Your testimony is sworn testimony.  Do

3    you understand that?

4        A    Uh-huh.  Yes.

5        Q    By that I mean that you're sworn to tell the

6    truth.

7        A    Yes.

8        Q    And that's the same kind of sworn testimony

9    you would give if you were in a courtroom --

10       A    Yes.

11       Q    -- before a judge.

12            Later on, if you change one of your answers,

13   then there could be some question later on in court

14   about why you changed your answer --

15       A    Okay.

16       Q    -- in court if it's different from what you

17   gave here today.

18       A    Okay.

19       Q    Do you understand that?

20       A    I understand.

21       Q    If at any point during the deposition you want

22   to, while we're here today, change an answer, add to an

23   answer, modify an answer that you previously gave, no

24   problem, you just let me know and you can go ahead and

25   do that.

1       A     Okay.

2       Q     Finally, or almost finally, are you taking any

3  medications that would interfere with your ability to

4  comprehend and answer my questions?

5       A     No.

6       Q     All right.  And is there any reason today that

7  you don't think you can give full, complete, and

8  accurate answers?

9       A     No.  I'm fine.

10      Q     Do you have any firearms on your possession?

11      A     Not on my person.

12      Q     All right.  And do you have two firearms in

13  the room?

14      A     I have three firearms in the room.

15      Q     All right.  What are the three firearms?

16      A     One is my, quote, M4A1 that I showed you at

17  High Noon Guns.  The other one is the AR-15, the 20-inch

18  barrel AR-15, that I showed you at High Noon Guns that

19  your expert tested.  I also have a Romanian SAR-2, which

20  is an AK-74 clone, and I have -- that was in the video

21  that I sent to you guys.

22      Q     All right.  So you have two AR rifles and an

23  AK?

24      A     An AK.

25      Q     All right.  Do you have any weapons in your

1    car?

2         A    I have my concealed carry gun.

3         Q    Okay.  And is it loaded?

4         A    Yes.

5         Q    What kind of weapon is that?

6         A    I'd rather not say, if that's okay.  You don't

7    want to tell everybody your concealed carry gun because

8    then they will say, "Hey, he pulled it on me."

9         Q    Well, we're not going to -- if there is

10   anything that, by law, needs to be redacted, we'll

11   redact it.

12        A    Please redact it.

13        Q    So --

14        A    It is a Ruger® LC9, nine millimeter.

15        Q    Do you have any other loaded weapons in your

16   vehicle?

17        A    Not to my knowledge, no.

18        Q    Okay.  Tell me a little bit about your

19   education.

20        A    Went to college for a while.

21        Q    Where did you go to college?

22        A    Manatee Community College.

23        Q    How many credits do you think you earned

24   there?

25        A    I earned my associate's in arts.  And I

1    decided that wasn't the smartest avenue for me.

2        Q    What years did you attend?

3        A    Oh, off and on from '99 to '06, I earned

4    credits here and there, delved into different topics.  I

5    also went to USF for a while.

6        Q    When was that?

7        A    '06, I think.

8        Q    How many credits, if any, did you earn there?

9        A    Oh, I don't know.  Under 12.

10       Q    Okay.  Was that here in Manatee --

11       A    Yes.

12       Q    -- Sarasota area?

13       A    Yes.

14       Q    Okay.  Other than attending Manatee Community

15   College and USF, have you attended any other schools and

16   received any other education after high school?

17       A    Barring any small, like, you know, I took a

18   class on this and took a class on something small, or

19   are we talking about, like, an accredited university?

20       Q    Well, let's first talk about an accredited

21   university or college.

22       A    No, I don't think so, no.

23       Q    Have you taken any professional training

24   classes?

25       A    I've been trained in firearms at Self-Defense

1    Firearms & Hobbies, I have had training for my concealed

2    carry class, and I learned how to -- learned the ins and

3    outs of the concealed carry class.

4         Q    We'll talk about that in a little bit.

5         A    Okay.

6         Q    Other than those two, the classes -- the

7    self-defense and the concealed carry, have you taken any

8    other professional training or education classes?

9         A    In relation to firearms?

10        Q    Sure.  We'll start there.

11        A    I don't think there really are because there

12   is no authority in that.

13        Q    Okay.  Other than firearms, have you taken any

14   professional training or education classes?

15        A    You're having to make me think for a second.

16        Q    Take your time.

17        A    Nothing is really popping into mind for me.

18   But, I mean, I do -- I have my hands in a lot of pies,

19   and I teach myself, for the most part.

20        Q    I understand.

21        A    I didn't have any training classes to become

22   an attorney either.

23        Q    Okay.  Let's talk about now your employment.

24        A    Sure.

25        Q    And you can go ahead and just use from 2006 to

1    2018.

2         A    Okay.

3         Q    So those 12 years right there.  If you'd start

4    with 2006 and go forward and tell me what employment

5    you've had and what you did.

6         A    2006.  I'm trying to say I was working in a

7    call center at the time.  I was -- I had worked at the

8    college because I was working there as a title three

9    instructor.  Right?

10        Q    At the college.  You mean Manatee Community

11   College?

12        A    Manatee Community College.

13        Q    Okay.

14        A    They would hire a student who had already

15   completed their degree to teach other students.  There

16   was a peer assistance program, and I was part of the,

17   quote, title three program, and so I would teach

18   students math and science and computer science.

19        Q    So from 2000 -- in 2006 you worked at the call

20   center at Manatee Community College?

21        A    No, it wasn't a call center.  That was -- what

22   was that?  That was Scarborough Research.  You call

23   people up and you beg them to take surveys.

24        Q    You worked for a company that did research

25   surveys?

1      A     Research surveys.

2      Q     All right.  How long in 2006 did you work for

3   that company?

4      A     Just a few months.  They use you up and spit

5   you out.

6      Q     After that, what did you do?  And for what

7   company, if any?

8      A     For a while I didn't do anything.  And then I

9   decided to shoot weddings and --

10     Q     When did you begin doing that?

11     A     -- photography.

12           2006.

13     Q     Okay.

14     A     I bought the camera equipment, and I bought

15   everything.  I wanted to change my life for the better

16   and do what I wanted to do with my life rather than what

17   someone told me to do with my life, and so I decided to

18   build that life for myself.

19     Q     You bought the equipment and you shot

20   weddings?

21     A     Shot weddings and I did business parties and

22   then I started doing business-related videos.  That

23   switched to process videos.  A video for a company that

24   wants to show employees how to use something, that would

25   be a process video.  Or a company that has a factory and

1    they want to show how their product would be bottled or

2    made or manufactured.  I think a great analogy would be

3    how it's made.  All right?

4         Q    How long did you do that work?

5         A    Off and on.  I still do some of that today for

6    people if they ask me.

7         Q    Did you do that beginning in 2006 full-time?

8         A    None of that's full-time.  I do -- give a good

9    example of what I do, it's more of -- I call it the

10   octopus arms because I have a hand in every little thing

11   making a little bit of money.  So if one thing becomes a

12   burden, I can just cut it loose.

13        Q    So tell me, from 2006 to present, other than

14   shooting weddings off and on, what else have you done?

15   Again, take me chronologically, if you could.

16        A    I worked at Self-Defense Firearms & Hobbies in

17   2010 to 2014.  I think that's what I said in my

18   affidavit.  If I need to correct that, I'll correct

19   that.

20        Q    So you worked at Self-Defense --

21        A    Firearms & Hobbies.

22        Q    -- Firearms & Hobbies in Palmetto, Florida?

23        A    In Palmetto, Florida.

24        Q    And that was from 2010 to 2014?

25        A    If that what it says in my affidavit.  I can

1    check the text message he sent me so I can double-check.

2         Q    That's what it says.

3         A    Okay.

4         Q    And did the business close in 2014?

5         A    He closed the business because he wanted to --

6         Q    No, no.  I'm sorry.

7              Did he close the business in 2014?

8         A    I believe so, yes.

9         Q    All right.  When you worked there from 2010 to

10   2014, what were your duties?

11        A    I sold firearms online, I did gunsmithing for

12   him under his license, and I inspected firearms and made

13   sure they weren't -- they were safe.  I also built some

14   parts on parts kits -- never assembled the whole firearm

15   because he didn't have a manufacturing license -- and we

16   set those into the cases, and I put guns into the safe.

17   It was just regular duties like that.

18        Q    Anything else at that Self-Defense Firearms &

19   Hobbies?

20        A    I helped him paint.

21        Q    All right.  So you did a number of general

22   things in the store?  I guess you helped organize --

23        A    Chiefly, gunsmithing.  That was the most

24   important part of what I would do.

25        Q    Okay.  We'll talk about that just a little bit

1   later, about gunsmithing.

2          Did you work there full-time or part-time?

3      A    Part-time.

4      Q    And approximately how many hours a week from

5   2010 to 2014?

6      A    I wouldn't really know.  I was -- when I was

7   needed, I was called in, and then he would write me a

8   check.

9      Q    Uh-huh.

10     A    So he said, "Adam, I need you in for this,"

11  and I said, "Sure."

12         And he would say, "Well, thanks for fixing

13  that gun.  I'm going to give you" -- 25 percent of how

14  much it cost I charged him.  Right?

15     Q    I understand.

16         Again, if you could estimate on a monthly

17  basis how many hours a week per month -- worked per

18  month from 2010 to 2014.

19     A    Maybe ten.  Something like that.

20     Q    Okay.

21     A    Yeah.

22     Q    All right.

23     A    That's just an estimation.  I could be wrong.

24     Q    All right.  From 2000 -- again, from 2006 to

25  present, I know you shot the weddings, you did that off

1    and on, and you went ahead and you jumped over to 2010.

2    Did you do anything else from 2006 to 2010?

3         A    Yes.  I shot weddings and videos and things

4    like that.

5              In 2010, I decided to change and try to enter

6    the film industry.

7         Q    I understand.

8         A    In 2011, I started working for Filming Florida

9    Productions, Incorporated.  I think they were

10   incorporated.  If they're not, well ....

11        Q    All right.  So that's what you -- you did a

12   little bit yourself in 2010?

13        A    Uh-huh.

14        Q    Then you said, in 2011, you began working for

15   that company?

16        A    Filming Florida.  Yeah, Film Flo is what they

17   would call it.

18        Q    And you worked for that company from 2011

19   until when?

20        A    Until they closed, I think, in 2014.

21        Q    Okay.

22        A    He was not a good manager of money.

23        Q    I understand.

24             And you did not work there full-time?

25        A    I shot a movie for him.

1      Q     But, from 2011 to 2014, you would not have

2   considered that to be full-time work?

3      A     None of what I do is 40-hour-per-week work.

4   It's -- you get a contract to do a job.  He contracted

5   me to shoot a movie called Text Message.  It's on IMDb.

6   He also contracted me to do a PSA, public service

7   announcement.  He also contracted me to do -- I'm trying

8   to think of all the little things he had me do.  It was

9   parties.  There was the airport hanger party, there was

10  the film festival party.  There was a lot of parties.

11  It's hard for me to remember because there were so many.

12     Q     Approximately how many hours per month from

13  2011 to 2014 do you think you put into the work for that

14  filming company?

15     A     A lot.  Some days [sic] you worked 80, 90

16  hours for just this one film.  You know, it's 11, 12

17  weeks of shooting, and it's constant.  So I wouldn't

18  want to give a -- I have no idea.

19     Q     Did you do anything else from 2011 to 2014,

20  other than the occasional work at Self-Defense Firearms

21  & Hobbies and then the work for that film production

22  company?

23     A     Yeah.  I worked for one of my friends that is

24  a great person, and he started his company called ATX

25  Aerials.  It's a website.  And they do aerial footage,

```
 1   and he flies while I film.  That's how you get aerial

 2   footage in T.V. commercials and movies.

 3        Q    When did you begin and stop working for ATX

 4   Aerials?

 5        A    I don't know when he founded the company

 6   because it was -- it's all kind of organic.  I can't

 7   remember that.  But it was around the 2014 mark he

 8   decided to do that because that's when he left Florida

 9   for Texas.

10        Q    I understand.

11             So why don't we do this, then.  I think

12   we're -- except for something here and there, I think we

13   can pretty much narrow it down, then, from 2014 to

14   present.

15        A    Right.

16        Q    So now we're only talking about four years.

17        A    Yeah.

18        Q    So tell me now, then, what you've done in the

19   last four years for employment.

20        A    For employment?  Boy, you really want to know

21   how much I make.

22        Q    You worked for ATX Aerials?

23        A    I do on occasion still.

24        Q    All right.  And, on average, how many hours

25   per month do you think you've worked for ATX Aerials in
```

```
 1   the last four years?

 2       A    Average of hours.  Probably eight to ten.  We

 3   get one job that's very short, but it pays a lot of

 4   money.

 5       Q    I understand.

 6       A    Yes.

 7       Q    Have you worked for anyone else or have you

 8   done any other employment in the last four years in

 9   addition to working for ATX Aerials?

10       A    Yeah.  I have my own little businesses.  I've

11   done computer work on the side for people.

12       Q    When you say "computer work," computer repair?

13       A    Computer repair.  I used to do that as a

14   teenager.

15       Q    In the last four years, how many hours per

16   month have you done some computer repair on the side?

17       A    Maybe one or two.

18       Q    All right.  Tell me all the other things, if

19   any --

20       A    I'm starting my new company, RackStorage.US.

21       Q    Before you start telling me about the new

22   company --

23       A    Sure.

24       Q    -- let's go through the last four years.

25       A    Okay.
```

1      Q      What else did you do 2014 to 2018?

2      A      All right.  I store data on my computers for

3  film companies who want off-site back-up data, and they

4  pay me money to store their data.  They mail me a hard

5  drive.  And I'm taking that company large here in the

6  next few months.

7      Q      All right.  So you did within the last four

8  years?

9      A      Yes.

10      Q      Approximately how many hours per month did you

11  store data for off-site companies?

12      A      Store it 24 hours a day seven days a week.

13  It's passive income.

14      Q      I understand that it's contained within the

15  computer system --

16      A      Yes.

17      Q      -- during that time, but how many hours did

18  you devote toward the storing process per month?

19      A      Oh.  Once it's built up, not much.  It's just

20  one hard drive.  I plug it in and dump the data.  It

21  takes maybe an hour.  So how many a month?  Maybe five

22  hours a month dumping it out.

23      Q      All right.  Have we left any other employment

24  out, things that you've done for employment, in the last

25  four years, other than the ATX Aerials, the computer

1    repair, and storing data for those off-site companies?

2         A    I do -- I'm sure there's something.  It's just

3    hard for me to remember.  There's so many things.  I

4    have my hands in a lot of pies.

5         Q    I understand.  But sitting here today, there's

6    nothing else that comes to mind?

7         A    I've worked for Orensis Films, I know that, at

8    one point.  I don't know how many hours I put in.  He

9    just hired me for a day, you know.

10        Q    Anything else that comes to mind right now?

11        A    Nothing that comes to mind.  If it comes to

12   mind later, I'll let you know.

13        Q    Yes, sir.  Thank you very much.

14             All right.  Now, about that new business you

15   just mentioned before, what would that be?

16        A    RackStorage.US

17        Q    R-a-c-k?

18        A    Uh-huh.

19        Q    Storage.

20             And tell me what you would be doing there.

21        A    It will be a large-scale storage of all the

22   data that I already store for my friends and companies,

23   right, and it will be a large scale so anyone can sign

24   up and have their data backed up.

25             I've purchased racks to -- giant

```
 1   six-and-a-half-foot rack that will hold nothing but

 2   computer servers and hard drives for that.  And so that

 3   will generate, I'm guessing, quite a bit of passive

 4   income.  I'm charging $50 per terabyte of storage.

 5        Q    At the present time you're just in the set-up

 6   stage for that business?

 7        A    I have 16 hard drives set up already for the

 8   small scale, and they already pay me money for this.

 9   I'm kind of already into it, but I'm kind of --

10        Q    How long have you been doing the operation of

11   Rack Storage?

12        A    I just registered the domain, I think, last

13   week.

14        Q    And, in addition to registering that domain

15   last week, how long have you been doing any business,

16   generating income, from Rack Storage, just within the

17   last week or so?

18        A    No.  I've been -- well, I've been making money

19   -- it just -- it hasn't been under that name of Rack

20   Storage.

21        Q    I understand.

22        A    Yes.  Yes.  It's all organic, it's not a

23   start-stop thing.

24        Q    I understand.

25             That was storing the data for the off-site
```

```
 1   businesses you're talking about?

 2        A    Off site, yep.

 3        Q    Okay.  Now you're just going to do it in a

 4   little bit more formal manner and incorporate a business

 5   or actually start a business entity?

 6        A    Uh-huh.  I'll be able to hold the data from --

 7        Q    When you say "uh-huh," does that mean yes?

 8        A    Yes.  Yes.

 9        Q    All right.

10        A    I'll be able to hold the data from the Library

11   of Congress on my machine.  It will be massive and

12   expensive.

13        Q    All right.  Let's switch subjects now.  Have

14   you ever been convicted of a felony?

15        A    Never ever.

16        Q    All right.  How about a misdemeanor of

17   domestic violence?  Ever been convicted of that?

18        A    Never.

19        Q    Okay.  Within the last three years, have you

20   received any suspended sentences or adjudications of

21   guilt withheld for any felonies?

22        A    Never.

23        Q    Same question about misdemeanor crimes of

24   domestic violence?

25        A    Never.
```

A-1 COURT REPORTING (941) 366-6634

1    Q    Or misdemeanor crimes of violence?

2    A    Never.

3    Q    Okay.

4    A    I've only gotten one traffic ticket ever.

5    Q    All right.

6    A    Make sure that's on the record.

7    Q    Are you currently under any Court orders

8    relating to domestic violence or repeat violence?

9    A    None.

10   Q    All right.  Were you ever adjudicated to be

11   mentally incompetent?

12   A    No.

13   Q    Were you ever committed to a mental

14   institution?

15   A    Never.

16   Q    All right.  Do you drink alcohol?

17   A    Never.

18   Q    All right.

19   A    I do not smoke and I do not do drugs.  I stay

20   healthy.  I work out regularly.

21   Q    Okay.  Were you ever in the armed forces?

22   A    No.  I kind of feel like I should have been,

23   but my recruiter couldn't come to terms with me.

24   Q    I understand.

25        Have you ever been arrested?

 1       A    Never.  I -- I take that back.  I was walking

 2  to Self-Defense Firearms & Hobbies, and I walked out, I

 3  had my pistol out on my hip because everyone who works

 4  there has to be armed, and a police officer put me in

 5  his car and he drove me around the block back to the

 6  front of the gun shop where all the police officers were

 7  laughing at me.  I have never been officially arrested,

 8  but they did that as a joke.

 9       Q    Okay.  All right.

10       A    I don't want to get that guy in trouble.  He's

11  a good friend, actually.

12       Q    It is true that you've never used any weapons

13  as part of your occupation?

14       A    I used it as -- in Self-Defense Firearms.

15  We're required to have a weapon on me at -- on us at all

16  times in the case there was a store robbery, which there

17  was a store robbery in Palmetto, and the owner was shot

18  in the neck.

19       Q    Okay.  Did you ever discharge your weapon as

20  part of your employment?

21       A    As part of my employment?

22       Q    Uh-huh.

23       A    I was helping teaching concealed carry

24  classes.  I was not the instructor, but I was helping.

25  I don't remember if I fired a weapon during that or not.

1    I would say probably not.

2         Q    Okay.

3         A    But you have to fire the weapon as part of

4    your concealed carry class.

5         Q    This was just assisting the --

6         A    I was assisting the police officer.

7         Q    What kind of assistance did you provide?

8         A    A little bit of technical assistance and --

9         Q    Explain what that means.

10        A    -- the laws as well since I -- technical

11   assistance would mean keep the weapon pointed away at

12   all times, the firearm -- rules of firearm safety;

13   right?  Make sure it's pointed in a safe distance, keep

14   your finger off the trigger, that sort of thing.

15        Q    How many times did you do that?

16        A    Four or five times.

17        Q    A total of how many hours?

18        A    Five times three, so ....

19        Q    15?

20        A    15 hours, yeah.

21        Q    Okay.  Have you ever used and discharged

22   semiautomatic rifles as part of your occupation?

23        A    No.

24        Q    Have you ever received firearms training from

25   your employer in order to maintain competence in the use

1  of the firearms for that employer?

2      A    Yes, Self-Defense Firearms.

3      Q    What kind of training did your employer give

4  you when --

5      A    We -- he built a house.  It was a run house

6  where we'd run through and sweep, you know, and make

7  sure we could not point our weapon at other people, you

8  know, make sure -- it was a -- it was part of what we

9  were going to build for training for the police and SWAT

10  for Palmetto Police and Palmetto SWAT.

11          They were to go into this house that we -- it

12  was plywood boards, and we were to go through the house

13  and find what we could shoot at and what you couldn't

14  shoot at.  That sort of thing.

15      Q    Did you use a rifle in that instance?

16      A    We used rifles and handguns.  Rifles are too

17  long generally, so ....

18      Q    How many times did you do a dry run-through in

19  that --

20      A    Oh, gosh.

21      Q    -- structure with a firearm?

22      A    It had to be dozens.  We did it so many times.

23  I don't remember how many times.  It was dozens.  You

24  drilled it into yourself until you knew what you were

25  doing.

```
 1        Q     Do you hold any certifications from the NRA as
 2   a firearms instructor?
 3        A     I don't believe the NRA has that authority, so
 4   I do not personally.  Otherwise, I would be an NRA
 5   instructor right now.
 6        Q     Okay.  The answer to the question, then,
 7   Mr. Roberts, is you don't hold any certifications --
 8        A     The answer is no.
 9        Q     -- from the NRA as a firearms instructor?
10        A     The answer is no.
11              Sorry for talking over you.
12        Q     Have you held any certifications or licenses
13   from any entity that enabled you to provide firearms
14   training or instruction to others?
15        A     I'm unaware there are really authoritative --
16   I'm unaware of any authoritative licenses, so I would
17   have to say no.
18        Q     Okay.  You have never held any licenses or
19   certifications as an advanced firearms training
20   instructor; correct?
21        A     That's correct.
22        Q     Now, you've never held any licenses or
23   certifications as a tactical firearms instructor?
24        A     That's correct.
25        Q     You've never held any licenses or
```

1   certifications from the State of Florida as a Class K

2   firearms instructor?

3       A    To clarify, Class K is the carry permit for --

4   for what?

5       Q    It's to provide firearm instruction.

6       A    I'm unaware of this.

7       Q    Okay.  You've never held a Class K firearms --

8       A    Apparently not, no.

9       Q    -- license or certification?

10          And you've never trained individuals in the

11  use of firearms in order to qualify them to hold

12  certifications or permits for firearms?

13      A    Well, I would say I have, but not under my --

14  my license, but I assisted someone who was.  So I know

15  all the ins and outs.

16      Q    The 15 hours that you --

17      A    Roughly.

18      Q    -- provided?

19          Tell me again for whom you worked in that

20  situation.

21      A    Yes.  It was the owner of Self-Defense

22  Firearms & Hobbies.

23      Q    And was he training members of the public?

24      A    Him and the police officers that were there to

25  train, and they were training, and so the police officer

1    that was trained to teach the course.  We had no

2    disagreements whatsoever.  He understood -- we

3    understood each other implicitly.  There was no --

4         Q    Have you ever individually trained individuals

5    in the use of firearms in order to qualify them to

6    receive a certification or permit for a firearm?

7         A    No.

8         Q    Have you ever hosted any programs where you

9    gave advice to the public on the use of firearms?

10        A    I may have when I was younger.  I would teach

11   people.  You know, if they wanted to go shoot with me,

12   they were welcome to go shoot with me.  You know, it's

13   -- firearms is just a basic thing.  It's not difficult.

14        Q    Mr. Roberts, this is just asking someone,

15   perhaps an acquaintance of yours, if they wanted to go

16   shoot with you.  Is that what you're referring to?

17        A    I think at college once I stood up in class

18   and asked anybody who wanted to shoot with me, and I

19   would host this program.  I also listed it on the board,

20   the bulletin board at the college, where you have strips

21   of paper and you write your phone number on it.

22        Q    Other than standing up in class and asking

23   anyone if they wanted to shoot with you, did you ever

24   host any programs, any forums, where you made

25   presentations to members of the public about firearms

1  safety and use?

2       A    Other than what I just described and some

3  people went with me to do that, and I gave them the ins

4  and outs.

5            I also did, as part of a movie in 2010, taught

6  individuals on proper firearms use because we were using

7  modified firearms for movie props.

8       Q    How many individuals did you provide any

9  advice to there?

10      A    Six.

11      Q    How many hours of time?

12      A    It was about four or five hours.

13      Q    Anything else that you haven't mentioned where

14  you would have assisted members of the public in -- in

15  groups about firearm instruction and safety?

16      A    Nothing I can recall.

17      Q    Okay.

18      A    If I remember it, I'll definitely tell you.

19      Q    Sure.

20           Now, the affidavit that you filed in the

21  court --

22      A    Yes.

23      Q    -- said, in paragraph 2, that you were trained

24  as a gunsmith?

25      A    Yes.

```
 1        Q    And we talked earlier about the fact that you
 2   were doing that work for Self-Defense Firearms &
 3   Hobbies.
 4        A    Uh-huh.
 5        Q    If I understand gunsmith work, it's repairing
 6   firearms?
 7        A    Repair of firearms and also -- yeah, it's
 8   repair of firearms.
 9        Q    All right.  And a gunsmith's duties in
10   repairing firearms does not include instructing
11   individuals in the use of those firearms?
12        A    It can if they do something stupid, like put
13   nine millimeter in a 40-caliber pistol, I'll tell them
14   don't do that anymore --
15        Q    When you were working --
16        A    -- because it jams the gun.
17        Q    -- part-time as a gunsmith with Self-Defense
18   Firearms & Hobbies, did you ever instruct individuals in
19   the use of the guns?
20        A    Yes, during the classes.
21        Q    Are you talking about the 15 hours that you
22   referred to earlier?
23        A    Yes.
24        Q    Other than that, did you do it in any other
25   way?
```

1      A     Here and there we'd have conversations.

2 There's always, in a gun shop, conversations about

3 firearms and firearm safety, especially a first-time

4 buyer.

5            When I would sell a weapon to someone, I --

6 you know, you don't sell them to somebody who has an

7 unsound mind.  You don't sell them to somebody who has

8 no idea how to use it.  You don't sell them to somebody

9 who is mentally or physically unstable.  You have to

10 make sure these are the proper factors when you sell

11 somebody a weapon.

12            So we have a conversation, and I talk to them

13 about guns and gun safety.  For the most part, most of

14 the people who walked in the door knew their stuff

15 inside and out, I could tell, about guns, and so I

16 didn't have any worry about them.

17            But there were a few that I would sit down,

18 and I would say, This is how you use this weapon.  This

19 is the way it works.  And I want to see you use this

20 weapon, and if you can do this successfully and safely

21 without sweeping yourself with the barrel, without

22 pulling the trigger or keeping your finger on the

23 trigger constantly -- that's a major problem --

24      Q     All of this is when you worked at Self-Defense

25 Firearms & Hobbies?

1        A    Yes.

2        Q    You told me earlier that most of the time when

3    you were in that store it was to do the gunsmith work;

4    correct?

5        A    Most of the time.

6        Q    All right.  Have you -- well, are there any

7    certifications that a gunsmith can obtain?

8        A    If you want to go into the business of a

9    gunsmith, you need a federal firearms license type 01 or

10   type 02, if you're a pawnbroker.

11       Q    So a gunsmith can achieve and receive

12   certifications?

13       A    Just -- it's only if you're going into the

14   business as a gunsmith, you need the federal firearms

15   license at the federal level.  It's an FFL.

16       Q    Have you ever, yourself, obtained any

17   certifications as a gunsmith?

18       A    Not as a gunsmith.  I own an FFL.  I have a

19   type 03 FFL, which means I am a licensed collector.

20       Q    That's different from being a gunsmith,

21   though; correct?

22       A    Yes.

23       Q    All right.  So the Self-Defense Firearms &

24   Hobbies has been closed since 2014.  And isn't it true

25   that that was a small store?

```
1        A    It was, yes.

2        Q    And it was basically a hobby shop?

3        A    It was a gun store with hobbies on the side.

4   So it was mainly a gun store, and on the side there were

5   models.  The reasoning why he added the hobbies to the

6   end of the gun shop was because of the licensing issue

7   with the City of Palmetto.  Otherwise, it would have

8   been a pure gun shop.  It would have said Self-Defense

9   Firearms.

10       Q    When you walked in, isn't it true that the

11  majority of the store had hobbies --

12       A    No.

13       Q    -- hobby equipment --

14       A    Guns.

15       Q    -- toys, models, and other sorts of things,

16  and, actually, the gun portion was a -- was a minority

17  location?

18       A    That is incorrect.  It was all guns and just a

19  few models hanging up.  Aerial vehicles is what he

20  called them, because he built those.

21       Q    Now, in your affidavit, you also say that you

22  have a license in Florida to carry a concealed weapon?

23       A    Yes.

24       Q    How long have you had that?

25       A    A number of years.
```

1      Q     How long have you been authorized to carry the

2   concealed weapon?

3      A     This current one was issued in 2016, and I

4   expired seven years before.  So 2009.  And I think that

5   was it.  There was a point in my life I did not like

6   government knowing who I was, so that's why I didn't get

7   my permit earlier.

8      Q     Mr. Roberts, you first acquired the concealed

9   carry permit in 2009, as best you can recall?

10     A     As best I can recall.  FDLE can give you a

11  better answer on that.

12     Q     How many hours of training did you have before

13  you received that concealed carry permit?

14     A     By the --

15     Q     How many hours?

16     A     By a class or by other people training me?

17  I've been trained on how to use firearms by multiple

18  people.

19     Q     When you were seeking the concealed weapons

20  permit.

21     A     That's a four-hour course, I think, three-,

22  four-hour course.  I'm going to say four hours.  They

23  teach you about the basics, they teach you about the

24  law, they teach you not to shoot yourself, and then you

25  go out and shoot the gun.

1    Q    Who gave you that training?

2    A    I don't know his name.

3    Q    Do you know where it was?

4    A    Yeah.  It was over at the Palmetto Civic

5    Center.  What do they call it?  Bradenton Area

6    Auditorium.

7    Q    Was that in conjunction with a gun show?

8    A    Yes.

9    Q    And is that the type of training where, at the

10   gun shows, the -- someone from the organization that's

11   there for the gun show loads the weapon, puts it on the

12   counter, you pick it up, you shoot it, you put the

13   weapon down, and then the fellow from the gun store --

14   the gun show has received all the information he needs

15   about your ability to shoot the gun?

16   A    That's what you need to get the certificate,

17   although I, personally, have had a lot of training

18   beforehand.

19   Q    But when you were doing this four-hour gun

20   course to -- to get the concealed weapons permit, what

21   did you do to demonstrate your competence to shoot the

22   weapon?  How many rounds did you shoot?

23   A    One.

24   Q    Okay.  And the -- otherwise, the other balance

25   of the time of the four hours was spent, you know, going

1    over rules or regulations, perhaps watching a video,

2    that sort of thing?

3         A    Yes.

4         Q    I understand.

5              Now, in your affidavit, you also say that you

6    manufacture firearms?

7         A    Yes.

8         Q    All right.  Now, when you say "manufacture,"

9    I'm interested in your use of that word.  You don't

10   actually use machines to forge the parts on a basis of

11   any engineering designs; correct?

12        A    Do we know what forging means?  Forging is a

13   press.

14        Q    Do you have machines at home?

15        A    I have C -- I have CNC equipment, which is a

16   milling machine.  So it would -- you'd take a forging,

17   which has been forged for you, because a forging is

18   stronger, and you would mill out the forging and then

19   broach the magazine well, and then you'd create the

20   firearm that way.  I have several photos, if you wish to

21   see.

22        Q    Okay.  Other than the milling, that's the way

23   in which you -- that's what you think of when you think

24   of manufacturing parts or manufacturing firearms?

25        A    I don't know what people think.  But when I

1   think of manufacturing, I think of forging, I think of

2   hammering, I think of milling and cutting because those

3   are the operations that are required in the manufacture

4   of firearms.

5       Q    Okay.  Well, you know, what also is required

6   is making molds to create parts.  You don't make molds

7   to create parts?

8       A    Molds are very weak so --

9       Q    No, no, no.  I'm just asking.  You don't make

10  molds to create parts?

11      A    No, I do not.

12      Q    Okay.  And you don't make parts from molds?

13      A    No.

14      Q    All right.  And, instead, isn't it true that

15  the bulk of the manufacturing of firearms that you're

16  talking about is taking various pieces, separate pieces,

17  and putting them together --

18      A    That would be --

19      Q    -- to create a weapon?

20      A    That would be assembly.  I'm talking about

21  actually milling it out of a block of metal, and that's

22  what I did.  I actually milled it from a block of metal.

23  We came up with a -- I've done this with a forging and

24  I've also done this with an 80 percent.  And what you do

25  is that you forge -- you -- you use the milling machine

1    to cut that out.  You have to worry about backlash, you

2    have to worry about chatter, and you have to worry about

3    all those things.  You also have to program the machine

4    to make sure it does what it needs to do.  You also have

5    to worry about cooling.  There's a lot of things that

6    you have to worry about.  And I tell you what, you

7    can't --

8        Q    Was that for one particular weapon?

9        A    I've made -- we'll say dozens.

10       Q    By doing what process?

11       A    The exact same process I have mentioned.

12       Q    Okay.

13       A    I know my ins and outs on how this works.  I

14   have taken the time, and I know exactly how these rifles

15   are built, and I understand the mechanics behind them.

16       Q    Did you read Joe Naples' expert report?

17       A    I did.

18       Q    Okay.  And do you remember reading the portion

19   of Mr. Naples' report where he described his knowledge

20   and experience with the use of firearms?

21       A    I did.

22       Q    Okay.  And do you admit that Mr. Naples'

23   knowledge and experience in the use of firearms is

24   superior to yours?

25       A    No.  Nowhere close.

1              Thank you.

2       Q    Is it your contention that your knowledge of

3  the use of firearms is superior to his?

4       A    Far.

5       Q    Explain why.

6       A    He didn't try to bump fire without a bump

7  stock, for the first point.  If I were an expert, I

8  would expect someone to try to bump fire without a bump

9  stock because he would understand what bump fire is,

10  unless he's a shill, who is only paid to come up with

11  the answer that he's supposed to as an expert, rather

12  than somebody who is unbiased.

13              And I mentioned this to him several times

14  during the test, and he shook his head no, he didn't

15  want to do that.  Either he didn't know how or he didn't

16  want to.

17              Number two, he didn't understand the mechanics

18  behind how it worked.  He said, "That's cool" when I

19  mentioned the bolt.  How many people know about a bolt

20  and resetting triggers, right, and creek?  He didn't

21  seem to understand when I talked about those things.  He

22  didn't understand what uptake meant.  Right?

23              He talked about an AR-15 is a direct

24  impingement weapon.  It's not a direct impingement

25  weapon.  People call it direct impingement, direct

1    impingement meaning that gas travels through the barrel

2    with a hole through the barrel and there's a hole --

3    well, a tube that lets the gas through and that pushes

4    against the bolt carrier group.

5            How an AR-15 actually works it that it has an

6    internal piston.  The bolt has rings on it, and that --

7    the rings causes a gas seal, and that pushes the bolt

8    back causing the carrier to go back, which unlocks the

9    action.  He didn't mention that.

10           So I think he's not -- he is -- understands

11   weapons on a basic level, but he doesn't understand them

12   on an intuitive level that I understand them, and I

13   understand them on an intuitive level.

14       Q    Are there any other reasons you haven't

15   expressed that you believe that your knowledge of the

16   use of firearms is superior to Mr. Naples?

17       A    I feel like -- you know, he said he was a

18   police officer and he did firearms training.  He said he

19   did -- he was in the military.  Those things -- you're

20   in the military, you can't open your weapon up.  You're

21   not an armorer.  You're not somebody who is authorized

22   to do that.  You use your weapon, you turn it in.

23           If you open that weapon up in the military,

24   you can get in some serious trouble, from everyone I've

25   talked to, and these are military personnel.  You open

1    that weapon up, you're in trouble.  You don't understand

2    the mechanics of how the weapon works.

3            Number two, I like to say that the biggest

4    liars in the world are used car salesmen, firearms

5    instructors, and lawyers.  And there's a reason why.

6    And weight trainers, personal trainers.  Because there's

7    no authoritative figure.  There's no authority.  You

8    can't be a firearms instructor given by a certificate by

9    some real authority.  It's always lacking in some way,

10   in my opinion.

11       Q    Anything else?

12       A    He just didn't know as much as me, but there

13   are few people who do.

14       Q    Why do you think -- first of all, if I look at

15   your affidavit, it seems to indicate that you believe

16   you are a firearms expert?

17       A    Uh-huh.  Self-proclaimed.

18       Q    Sorry?

19       A    Self-proclaimed.

20       Q    Okay.  Has anyone ever indicated to you they

21   felt you were a firearms expert?

22       A    Absolutely.

23       Q    All right.

24       A    They come to me.

25       Q    Tell me all the reasons why you think you're a

 1    firearms expert.

 2         A    I understand the ins and outs, the mechanics

 3    of how things work.  I understand metallurgy.  I

 4    understand physics.  I understand all these things,

 5    right, and not just on the cerebral level, but I

 6    understand on the fundamental level.

 7              There's a point where you work your job that

 8    not only do you understand the mechanics, but it becomes

 9    natural.  It becomes just organic.  It's who you are.

10    And you don't even have to think about it.  That's the

11    way I feel like with guns.

12              It's been 25 or more years.  I remember back

13    in the 1980s when I was shooting guns how expensive

14    ammunition was, and in the '90s, and in the 2000s, and

15    then now 2010s, where we are right here.  I've been

16    doing this for a very long time.

17         Q    Okay.  Anything else you haven't said so far?

18         A    Nothing has come to me yet, but it might.

19         Q    All right.  Let me show you what I'll have

20    marked as Exhibit 1, Defendant's Exhibit 1 to the

21    deposition.

22         A    All right.

23              (Defendant's Exhibit 1 was marked.)

24    BY MR. BOWDEN:

25         Q    I'll ask you to take a look at it.

```
 1        A    Yep.

 2        Q    First take a look at it and read it, if you

 3   would.

 4        A    Do I need to read it out loud?

 5        Q    No, no.  Please read it to yourself, and then

 6   I'll ask you some questions about it.

 7        A    Okay.  If we can keep this paper here, it

 8   would be nice.

 9        Q    Oh, yeah.  That's yours.

10        A    Okay.  I've read this many times.  It makes me

11   mad every time.

12        Q    Now, isn't it true, Mr. Roberts, that what the

13   statute bans is it bans a conversion kit; correct?

14        A    Conversion kit, a tool, an accessory or

15   device.

16        Q    Or a device?

17        A    Uh-huh.

18        Q    Okay.  And it has to be used to do certain

19   things, this conversion kit, tool, accessory or device;

20   correct?

21        A    It has to be used and it has to increase the

22   rate of fire.

23        Q    It has to be used to do something?

24        A    Uh-huh.

25        Q    All right.  All right.  So --
```

1        A     That's a yes, by the way.

2              THE COURT REPORTER:  Thank you.

3   BY MR. BOWDEN:

4        Q     Based on your reading of the statute, wouldn't

5   you agree with me that this kit, tool, accessory or

6   device has to be either attached to or put in or on the

7   weapon?

8        A     No.

9        Q     All right.  Why do you disagree?

10       A     Because a screwdriver, as I demonstrated, was

11  a bump fire stock because it was a tool that was used to

12  alter the rate of fire, to mimic automatic weapon fire,

13  which is used to increase the rate of fire faster, and

14  it's possible for a person to fire such a semiautomatic

15  firearm unassisted by a kit, tool, an accessory or

16  device.

17       Q     So it's your position that a screwdriver --

18       A     Yes.

19       Q     -- is a tool and that screwdrivers are banned

20  under the statute?

21       A     Could very well be.

22       Q     Are all screwdrivers in the State of Florida

23  banned under this statute?

24       A     It's up to the judge to interpret law that

25  way.

1      Q    No.  I'm asking what your position is here in
2  this case.
3      A    It would be constructive possession, in my
4  personal opinion.  So if you owned a firearm that had a
5  device like this and you had a screwdriver, then, yes,
6  it would be constructive possession.
7      Q    So is your position in this case that all
8  screwdrivers in the State of Florida are banned under
9  this statute?
10     A    I believe possibly, yes.
11     Q    Okay.  If I use -- if I had a hard time
12 getting a part off of the gun --
13     A    Uh-huh.
14     Q    -- and I used one of those little rubber
15 grippers --
16     A    Uh-huh.
17     Q    -- and I used the rubber grip to pull a part
18 off of the gun or insert a part into the gun --
19     A    Uh-huh.
20     Q    -- would that rubber gripper be a device or
21 accessory, in your view, under the statute?
22     A    It would have to increase the rate of fire.
23     Q    Well, it would lead to the insertion or
24 attachment to something that --
25     A    Possibly.

```
 1      Q    Okay.  So, under your reading of the statute,
 2  as we just explained, would all rubber gripers in the
 3  State of Florida potentially be banned by the statute?
 4      A    Stranger things have happened, yes.  I've seen
 5  that happen.
 6      Q    So your answer is yes?
 7      A    I believe it may be possible, yes.
 8      Q    All right.  Now, the screwdriver -- let's just
 9  talk about that for a minute -- you don't leave that in
10  or on the weapon?
11      A    It's not needed to.
12      Q    Is the answer to the question yes?
13      A    Yes, it can be detached.
14      Q    I'm sorry?
15      A    Yes, it can not be left on the weapon.
16  There's -- it's not necessary to leave it on the weapon.
17      Q    Well, in fact, you can't.  You can't -- you
18  can't leave a screwdriver in or on the weapon?
19      A    I would assume one could if they tried, but it
20  would be not smart.
21      Q    All right.
22      A    Of course, possibly not safe.  I don't know.
23      Q    Now, the statute doesn't ban firearms
24  themselves; correct?
25      A    It could.
```

1    Q    How?

2    A    Well, if, say, for example, the -- I don't

3  contend the Slide Fire® is a bump fire stock.  But, say,

4  if the judge says it is, then every semiautomatic weapon

5  would be a bump fire stock.

6    Q    Okay.  Let's go back to the reading the

7  statute.

8    A    Okay.

9    Q    We agreed before that what was banned under

10  the statute were conversion kits, tools, accessories or

11  devices; correct?

12    A    Yes.

13    Q    Okay.  And you would agree with me that a

14  rifle is not a conversion kit?

15    A    A conversion kit could be part of a rifle.

16    Q    Okay.  A rifle -- the rifle itself is not a

17  conversion kit?

18    A    It would have to be an unmodified, straight

19  factory standard rifle.  It could not be modified in any

20  way pertaining to its fire control group that would

21  allow it to fire at a faster rate.

22    Q    Mr. Roberts, is a fire -- is a rifle a

23  conversion kit?

24    A    Is a rifle a conversion kit?  It may not.

25    Q    Okay.

1    A    But there may be some exception here that --

2    Q    Okay.

3    A    -- but one hasn't come to mind yet.

4    Q    Is a rifle a tool?

5    A    Yes.

6    Q    A rifle is a tool?

7    A    A rifle is a tool.  It's a tool to fire

8    bullets.

9    Q    Is a -- a rifle a tool in the same manner that

10   you contend your screwdriver was a tool?

11   A    They're absolutely the same in that respect.

12   Q    What does the rifle -- how is the rifle used

13   to add to or take away something from another rifle in

14   the same way that a screwdriver would?

15   A    Take away or add to?  I'm not understanding

16   the question.

17   Q    Okay.  Let's go back.  Mr. Roberts, isn't it

18   true that when you read the statute, when you read the

19   statute, the plain meaning of these words to you,

20   conversion kit, tool, accessory or device, are items

21   that you would use to attach to or put something in or

22   on a weapon?

23   A    It could be construed to be that.

24   Q    All right.  And that -- again, based on your

25   reading of the statute, a conversion kit, a tool, an

1    accessory or device is not the weapon itself?

2         A    It can be part of a weapon.

3         Q    The part that you added that might not have

4    been the original stock of that weapon?

5         A    Or the fire control group of that weapon.

6         Q    Which you --

7         A    To me, this describes in detail a two-stage

8    trigger, a short reset trigger or that little bolt that

9    had the hole drilled through it with a threaded rod that

10   I have owned for a number of years.

11        Q    Because that hex bolt could be considered a --

12   what would you consider that, a device?

13        A    It could be a device, can also be an

14   accessory.

15        Q    Okay.

16        A    It could be a conversion kit because it

17   converts it.

18        Q    Okay.

19        A    It describes it to a T.

20        Q    Again, what we're talking about is we're

21   talking about items that would be in or on a firearm

22   under your reading of the statute, not the firearm

23   itself; correct?

24        A    Say that again, please.

25        Q    Sure.

1          Isn't it true that, under your reading of the

2     statute, these items that you believe are prohibited,

3     similar to the hex bolt, are only items that are placed

4     in or on a firearm, they are not the entire stock

5     firearm itself?

6          A    Correct.

7               To clarify, a firearm is only the receiver of

8     the firearm.  That's it.  The barrel is not the firearm,

9     the upper is not the firearm, the sights are not the

10    firearm, nor is the grip or the stock or the gas tube.

11              The firearm, according to the Bureau of

12    Alcohol, Tobacco, Firearms and Explosives, is the

13    receiver or the frame of such weapon.  And if we're

14    talking about larger weapons, we're talking about the

15    casting, we're talking about the side plate, if we're

16    talking about a large cannon that goes into an aircraft.

17         Q    Okay.  On September 12th -- I beg your pardon.

18    Let's see here.  On September 20th --

19         A    20th, that's right.

20         Q    -- I asked you to bring to High Noon Guns all

21    the items that you believed were prohibited under the

22    statute that you owned; correct?

23         A    That's correct.

24         Q    All right.  And you brought three items to

25    High Noon Guns, did you not?

1      A    Three items to be tested, yes.

2      Q    Yeah.

3           And these are the three items that you thought

4  you owned or possessed that were banned by the statute?

5      A    That could be potentially banned, yes.

6      Q    All right.  First you brought a device called

7  a Slide Fire® stock?

8      A    Slide Fire® stock, that's correct.

9      Q    All right.  And that's manufactured by Slide

10 Fire® systems?

11     A    Yes.

12     Q    You purchased that in 2014?

13     A    Uh-huh.

14     Q    And --

15     A    Yes.

16     Q    -- it gets a little complicated with the name

17 of it.  We'll just call it a Slide Fire® stock.

18     A    That's perfectly fine with me.

19          MR. BOWDEN:  All right.  Okay.  Let's take a

20      look at what I'll mark as Exhibit 2 to the

21      deposition.

22          (Defendant's Exhibit 2 was marked.)

23 BY MR. BOWDEN:

24     Q    I'll ask if you can take a look at that

25 picture.  I'm referring now to the picture on the top of

```
 1   what you're holding and the picture on the bottom of
 2   what was placed on the table.
 3       A    That is a Slide Fire® stock.
 4       Q    Okay.  And is that not the Slide Fire® stock
 5   that you brought to High Noon Guns on September 20th?
 6       A    That is the exact same item.
 7       Q    And that was the item or device that you
 8   thought might potentially have been banned by the
 9   statute?
10       A    I did not think it was banned, but it had the
11   same name.  And the statute, it doesn't define that
12   stock, but it had the same name because people call
13   those things bump stocks and they also call them bump
14   fire stocks.  So I decided to bring it just to see.
15       Q    Okay.  So that Exhibit 2 fairly and accurately
16   represents the item?
17       A    Yes.
18       Q    It fairly and accurately depicts the item that
19   you brought to the High Noon Guns shop on
20   September 20th?
21       A    Yes.
22       Q    All right.  Now, you also brought to High Noon
23   Guns an AR rifle --
24       A    Yes.
25       Q    -- that had the standard stock on it that came
```

```
 1    with the weapon when you bought the weapon?

 2         A     I manu -- I built the weapon from parts.

 3         Q     Okay.  But it was a standard stock end of the

 4    weapon?

 5         A     Yes, standard A-2 style stock.

 6               MR. BOWDEN:  All right.  Now I'll show you

 7         what I'll have marked as Exhibit 3 to the

 8         deposition.

 9               (Defendant's Exhibit 3 was marked.)

10               THE WITNESS:  That is the one I manufactured

11         myself.  That is not the 20-inch AR, that is the

12         10.5 inch.  And it's also registered under the

13         federal government as a short-barreled rifle.  I

14         paid a $200 tax stamp for that.

15    BY MR. BOWDEN:

16         Q     Does the rifle that's on the table and the

17    rifle -- in the picture on the top and then -- that

18    you're holding and the picture on the bottom in Exhibit

19    3, is that the weapon that you brought to High Noon

20    Guns?

21         A     Yes.

22         Q     And is that also the weapon that was used to

23    remove the standard stock and put on the Slide Fire® --

24         A     I removed the LMT --

25         Q     -- Slide Fire® stock?
```

1       A     I removed the LMT SOPMOD stock, and I replaced

2   it with the SSAR-15 Slide Fire® stock.

3       Q     All right.  So the -- Exhibit 3 fairly and

4   accurately depicts the AR rifle that you brought and --

5   to the High Noon Guns on September 20th?

6       A     Yes, from my memory.

7       Q     All right.  And you also brought with you to

8   High Noon Guns on September 20 a hex bolt; correct?

9       A     It was a bolt, internal hex bolt.  Some people

10  call those cheese-head bolts because of the shape of the

11  head.  It is a typical AR-15 hex screw that fits into

12  the pistol grip, and I modified it.

13      Q     I'm just seeking to get one term to use.  I

14  know you've called it a screw, I think, I think you've

15  called it a bolt, hex bolt.  Can we all agree just on

16  one terminology for the item?

17      A     It is one item of many names.  If we pick one,

18  I'll stick to it.

19      Q     All right.  Is it fair to call it a bolt?

20      A     Bolt would be confused with bolt in the

21  weapon.

22      Q     Let's call it a hex bolt.

23      A     Hex bolt sounds great.

24      Q     All right.  The second item you brought to

25  High Noon Guns on September 20th that you thought

1   potentially was banned under the statute was a hex bolt?

2       A    That's correct.

3       Q    That was a bolt that had a hole drilled

4   through the center.  And then what you did was you, in

5   effect, inserted a smaller bolt inside of that?

6       A    Threaded rod, yes.

7            MR. BOWDEN:  Threaded rod, okay.

8            And let me show you what I'll have marked as

9       Exhibit 4 to your deposition.

10           (Defendant's Exhibit 4 was marked.)

11  BY MR. BOWDEN:

12      Q    I'll ask you if you can take a look at that;

13  in particular, the picture on the top of Exhibit 4.

14      A    I recognize that.

15      Q    Does that fairly and accurately depict the hex

16  bolt that you brought to the High Noon Guns on

17  September 20th?

18      A    It does.  It's not the best picture in the

19  world, but it will suffice.

20      Q    Okay.  And, in particular, we'll talk about

21  this a little bit later, but what you did was you took

22  that hex bolt and you inserted it into the fire control

23  group portion of the rifle; correct?

24      A    Correct.  I inserted it into -- let me correct

25  you.  I inserted it into the pistol grip hole.  Right?

1    And once I tightened it up, I used the screwdriver to

2    move that threaded rod up against the trigger,

3    therefore, taking up creep and taking up trigger reset

4    time and, therefore, once that's done, it takes a lot

5    less pressure to reset that and it also takes less

6    pressure to actually pull the trigger.  When that

7    happens, it makes it faster and easier to bump fire the

8    weapon, which you can do with either a bump stock or

9    without a bump stock.

10        Q    Mr. Roberts --

11        A    I'm trying to be clear.  Sorry.

12        Q    Well, I mean, I don't want to have to repeat

13   all these questions.

14        A    No problem.

15        Q    If you'd just try to address the question, it

16   would be appreciated.

17             Okay.  And you also brought with you to High

18   Noon Guns a screwdriver; is that not correct?

19        A    An eyeglass screwdriver, yes.

20             (Defendant's Exhibit 5 was marked.)

21   BY MR. BOWDEN:

22        Q    Okay.  I'll show you what I've marked as

23   Exhibit 5 to the deposition.  In particular, I'd ask you

24   to take a look at the photograph on the bottom.

25        A    That is the screwdriver, yes.

```
 1       Q    All right.  So that photo on the bottom also

 2   fairly and accurately represents the screwdriver that

 3   you brought to High Noon Guns on September 20th because

 4   you believe that item might also be banned under the

 5   statute?

 6       A    Correct.

 7       Q    All right.  Other than those three items --

 8   I'll just ask this one more time.  Other than those

 9   three items, you did not and do not possess yourself

10   anything else that you think might be banned under the

11   statute?

12       A    Not to my attention at that particular moment.

13   To my knowledge, we'll just say it that way.

14       Q    And that's true as of today as you sit here?

15       A    All of my bump fire stocks or what I consider

16   to be a bump fire stock is outside the State of Florida.

17       Q    Okay.  Let's talk about that one at a time, if

18   we can.

19            First, as to the Slide Fire® stock, what did

20   you do with that item?

21       A    It was mailed out.

22       Q    Mailed to whom?

23       A    I'd rather not give his name, if that's okay.

24       Q    Where does that person reside?

25       A    Texas.
```

1      Q    Is he a friend of yours?

2      A    Yes.

3      Q    And do you have an agreement with that

4 individual that he will mail it back to you if, as a

5 result of your lawsuit, the statute is declared

6 unconstitutional?

7      A    It may not be possible.  Due to the federal

8 regulations on bump stocks, it may have to be destroyed.

9      Q    Assuming there are no federal regulations

10 which would prohibit him to send it back to you, and

11 assuming you're successful in this lawsuit, do you have

12 an arrangement with that fellow that he'll send it back

13 to you, if you want it?

14      A    I'm sure he could, yes.

15      Q    I mean, that's the understanding you have.  If

16 you want it back, he'll send it back to you?

17      A    In the meantime, though, it would --

18      Q    I'm sorry, is that a yes?

19      A    Yes.

20      Q    Okay.  All right.  So, in your complaint, on

21 paragraph 21 you said there was no legal way to get rid

22 of a bump fire stock in Florida other than to destroy

23 it.  And just for clarification, you didn't destroy that

24 Slide Fire® systems device?

25      A    No.  The law wasn't enacted back then.

1      Q      Mr. --

2      A      I want to answer this, though.

3             The law wasn't enacted back then.

4      Q      Answer the question and then you can explain

5      after you answer the question, but first if you'd

6      address the question.

7      A      All right.

8      Q      The question was -- and I'll see if --

9      A      We'll start over again.

10     Q      In your complaint, on paragraph 21, you stated

11     that there was no legal way to get rid of a bump fire

12     stock in Florida other than to destroy it.  So,

13     obviously, if you sent it to an individual in Texas with

14     the agreement that if you wanted it back some day, he'd

15     send it back to you, you didn't destroy it; correct?

16     A      That is correct.

17            I'd like to add, though, what I was referring

18     to is once the law is enacted.  So right now there is no

19     legal way to get rid of a bump fire stock other than to

20     destroy it.  That's what I was saying.  So at the

21     current moment there is no way.

22     Q      What did you do with the hex bolt?

23     A      It is gone.  It is mailed to Texas.

24     Q      Did you mail it to the same individual --

25     A      Yes.

1     Q     -- that you mailed the -- you have to wait

2     until I'm done.

3     A     Go ahead.

4     Q     Did you mail it to the same individual you

5     mailed the Slide Fire Solutions device?

6     A     Yes.

7     Q     All right.  And did you simply have an

8     agreement with that fellow that if you want that hex

9     bolt back, he'll send it back to you?

10    A     I think I told him to keep it because they are

11    simple to make.

12    Q     All right.  Finally, we'll talk about the

13    third item that you brought to the gun range on

14    September 20th, which was that screwdriver.  What did

15    you do with the screwdriver?

16    A     It is mailed out of the state.

17    Q     Did you mail it to the same fellow in Texas

18    you mailed the hex bolt and the Slide Fire Solutions®

19    item?

20    A     Yes.

21    Q     All right.  Did you have an agreement with

22    that fellow that if you want that screwdriver back he'll

23    send it back to you?

24    A     Never had an agreement.  But if I wanted it

25    back, I suppose I could ask for it.

1    Q    And do you suppose he'd send it back to you?

2    A    Yes.

3    Q    All right.  This is a good friend of yours?

4    A    I know him.  Acquaintance.

5    Q    I understand.

6         Okay.  Let's talk about the Slide Fire

7    Solutions® device and the mechanics of what happens.

8    You replace the -- the end of the rifle, the stock end

9    of the rifle, and the trigger handle with the Slide Fire

10   Solutions® device; correct?

11   A    The pistol grip and the stock is replaced with

12   a Slide Fire® device.

13   Q    All right.  Pistol grip and the stock.

14        And when you insert the Slide Fire Solutions®

15   device, the way you would initiate the firing of the

16   weapon is to pull forward on the weapon, right, you'd

17   apply pressure forward -- if you're a right-handed

18   shooter, you're applying pressure forward with your left

19   hand; correct?

20   A    Correct.

21   Q    All right.  And what that does, then, is it

22   causes the Slide Fire Solutions® device to hit your

23   finger as you're pulling it forward, pulling the weapon

24   forward; correct?

25   A    Incorrect.  The trigger hits your finger, it

1  bounces back.

2       Q    Okay.  The trigger hits your finger?

3       A    That's right.  Or your finger hits the

4  trigger, either which way you want to say it.  Glass

5  half full or half empty.  It doesn't matter.

6       Q    Yeah.

7            And you're not extending your finger, you're

8  not flexing your finger, you're just holding your finger

9  there and the trigger, then, when you're applying that

10  forward pressure, the trigger hits your finger?

11       A    Correct, with or without a bump stock.

12       Q    Well, we're talking about the addition of the

13  bump stock now.

14       A    Okay.

15       Q    You may have your own thoughts and feelings

16  about what happens otherwise.  We're talking about the

17  addition of the Slide Fire Solutions® device.

18       A    Go ahead.

19       Q    If you'd just address my questions, I'd

20  appreciate it.

21       A    I'm just clarifying.

22       Q    When you had the Slide Fire Solutions® device

23  on the weapon, you apply pressure forward, that causes

24  the trigger to hit your finger, your stationary finger,

25  and the weapon discharges; correct?

```
 1       A    That's correct.

 2       Q    All right.  Then, after it discharges, it

 3  recoils, and after the recoil, it bounces back forward;

 4  correct?

 5       A    Forward pressure on your hand pulls it

 6  forward.  That's what's happening.  So I would say

 7  that's incorrect.

 8       Q    All right.  So forward -- the continued

 9  forward pressure on the weapon pulls the device forward

10  and it -- again, the trigger hits your finger and

11  discharges again?

12       A    Correct.

13       Q    And that cycle that you initiated with one

14  forward pressure and the discharge of the gun, that

15  continues over and over and over again.  And if you're

16  doing it correctly and you're holding that forward

17  pressure out, it would actually continue to discharge

18  until there's no more ammo in the weapon?

19       A    Sometimes.

20       Q    Again, if you're doing it where you're

21  continuing to hold that forward pressure out there?

22       A    Sometimes.

23       Q    You say "sometimes."

24       A    Sometimes you get lucky, sometimes it hiccups,

25  sometimes it stops, as we saw in -- the day we were out
```

1    there.  Your expert wasn't able to fire it in long

2    bursts.  There's a reason why.

3         Q    Initially.  Initially.

4         A    Even afterward.

5         Q    So would you agree with me that the forward

6    pressure that you assert on that weapon with your left

7    hand with the Slide Fire Solutions® device installed on

8    it, that's -- that's one operation?  You're extending

9    your left hand forward, and you're applying pressure on

10   the weapon?

11        A    Pulling forward doesn't fire the weapon,

12   though.  And I know what you're getting at.  But, no.

13        Q    Well, isn't it true that you initiate one

14   action or one operation with that Slide Fire Solutions®

15   device on the weapon and you're getting more than one

16   bullet for that one operation?

17        A    Incorrect.  The Slide Fire® has absolutely

18   nothing to do with the firing of the weapon.  The firing

19   of the weapon is done with the weapon and the trigger.

20   If you take the Slide Fire® off, you can do the exact

21   same thing.

22        Q    That's not -- Mr. Roberts, I'm not going to be

23   asking you right now at this point --

24        A    I'm clarifying.

25        Q    -- what you can do with the item off.

1        A     I understand.

2        Q     I'm going to show you your video, and I'm

3    going to ask you to explain to me how you can do that.

4    If you would just please answer the questions that I'm

5    asking you about the Slide Fire Solutions® device on the

6    weapon.

7        A     Okay.  I answered the question.  That was

8    incorrect.

9        Q     You'll have plenty of time later on to explain

10   how you think you can bump fire without any Slide Fire

11   Solutions® device on the weapon.  We'll go through that

12   later, and you can explain that.

13       A     Understood.  Move forward.

14       Q     Confine your answers, please, to this portion

15   of the exam that relates to the addition of the Slide

16   Fire Solutions® device on the weapon.

17       A     Repeat the question and I'll answer.

18       Q     Isn't it true that when you have the Slide

19   Fire Solutions® device on the weapon, you have

20   initiation of one action and, in response, you have many

21   bullets coming out of the weapon?

22       A     Incorrect.

23       Q     Is it your position -- what is -- what is your

24   position with regard to how you would get many bullets

25   to leave the weapon?  How many actions do you have to

 1   take?

 2        A    Are you referring to a semiautomatic weapon

 3   with a Slide Fire® stock or are you referring to a

 4   machine gun?

 5        Q    When -- okay.  Let's talk about the weapon

 6   that you brought to High Noon Guns on September 20th.

 7   Isn't it true that with that AR rifle, when you install

 8   the Slide Fire Solutions® device, and Mr. Naples, not

 9   initially, but after awhile when he understood how to

10   utilize the device, he initiated one operation, which

11   was the forward pressure with his left hand and, in

12   response, many bullets came out of the weapon?

13        A    Incorrect.

14        Q    That's not what you saw when you were standing

15   there?

16        A    No, I did not.

17        Q    What did you see when he applied -- this is

18   now not in the very beginning when he was unsure of how

19   to use the device, but this was once he attempted to use

20   it a few times and got the -- an understanding of how to

21   use the device.  What did he need to do -- what actions

22   did he need to take to get multiple bullets coming out

23   of the weapon?

24        A    He needed to pull the trigger each time, and

25   that is exactly what happened.

1       Q     You saw him flexing or extending his finger

2    pulling the trigger --

3       A     Not required.

4       Q     -- with the Slide Fire Solutions® device on

5    the weapon?

6       A     It was not required.  But as every

7    semiautomatic weapon, including --

8       Q     Mr. Roberts --

9       A     I need to answer this question clearly.

10      Q     Did you see him flexing or extending -- or

11   extending his finger more -- okay.  Back up for a

12   second.

13      A     Sure.

14      Q     When Mr. Naples had the Slide Fire Solutions®

15   device on the AR weapon and he applied the forward

16   pressure with his left hand, did you see him flexing or

17   extending his trigger finger at all?

18      A     No.

19      Q     Okay.  When multiple bullets came out of the

20   AR weapon, did you see him at any point needing to flex

21   or extend his finger?

22      A     No.

23      Q     Isn't it true, then, that what happened was,

24   once Mr. Naples got the hang of how to use the Slide

25   Fire Solutions® device, he applied forward pressure with

1    his left hand, which caused the trigger to brush his

2    stationary trigger finger and then shoot multiple

3    bullets out of the weapon?

4         A    No.  That's not what I saw.

5         Q    What did you see?

6         A    I saw the trigger being pulled for every round

7    fired, and it requires a pull of the trigger.  Whether

8    the trigger finger is stationary or whether the trigger

9    finger is moving, it is immaterial.  That is what a

10   semiautomatic weapon is defined as by ATF.  It shoots --

11   designed to shoot one round per pull of the trigger.

12   That's the definition.

13        Q    You never saw when Mr. Naples -- let's review

14   this.  When you saw Mr. Naples using the Slide Fire

15   Solutions® device and was shooting many bullets, not

16   just one, but many bullets out of the weapon, you did

17   not see him flex or extend his trigger finger at all?

18        A    Define extend.  Do you mean extend by moving

19   your index finger straight forward --

20        Q    Forward.

21        A    -- or do you mean extending by holding it

22   stationary?

23        Q    Forward.  Moving it forward.

24        A    It was not moved forward.  That's not how you

25   fire a weapon anyway.

```
 1        Q     Okay.  From what you saw, isn't it true that

 2   Mr. Naples' finger, his trigger finger, was stationary?

 3        A     Yes.

 4        Q     And the device, by bumping backwards and

 5   forwards, was brushing his stationary trigger finger;

 6   correct?

 7        A     The device?

 8        Q     Yeah, the Slide Fire Solutions®.

 9        A     Slide Fire® had nothing to do with it.

10        Q     The Slide Fire Solutions® device, which was

11   causing the weapon to bump forward after it recoiled

12   backwards --

13        A     Incorrect.

14        Q     -- was causing the trigger to brush his

15   stationary trigger finger?

16        A     Incorrect.

17        Q     Then you explain how you understand it

18   happened.

19        A     Slide Fire® stock is a comfort device.  It's

20   to be comfortable.

21        Q     Well -- okay.

22        A     Let me explain.

23        Q     I'm not asking for the dynamics.

24        A     I am.  This is where we're getting to.  This

25   is the meat and potatoes right here, man.
```

1       Q     By expressing it's a comfort device, which,

2   again, is your position, I understand --

3       A     It plays no part in bump firing.

4       Q     I'm asking you for the mechanics of what

5   occurred.

6       A     That's what I'm doing.

7       Q     Then just address the mechanics then.

8       A     All right.  Are you ready?

9       Q     Go right ahead.

10      A     His trigger finger is staying stationary while

11  the trigger is impacting his finger.

12      Q     His stationary finger?

13      A     His stationary finger.

14      Q     All right.

15      A     That is immaterial of a bump fire stock being

16  installed.

17      Q     I'm not asking you for the editorial at the

18  end of that, I'm just asking you to describe

19  mechanically what you saw, and you just described it.

20            How many operations -- strike that.  Let me

21  rephrase that.

22            Isn't it true that the only operation of the

23  weapon to discharge multiple bullets was the initial

24  operation of Mr. Naples extending his left hand forward

25  and at that point, after the weapon discharged, it was,

1    in effect, on automatic --

2        A    No.

3        Q    -- in that he never took any subsequent

4    actions, he simply maintained the forward pressure with

5    his left hand and allowed the trigger to keep brushing

6    back and forward on his right hand?

7        A    I didn't see it that way.

8        Q    Explain how you saw it.

9        A    I saw one finger -- I saw the trigger being

10   pulled every single time a round was fired.  That's what

11   I saw.

12       Q    You saw the trigger being pulled?

13       A    For every round that was fired.

14       Q    By that do you mean you saw Mr. Naples

15   initiating action with his trigger finger to either flex

16   or extend his trigger finger in order to get more than

17   one bullet out of the gun?

18       A    It's not required.  And there is no more than

19   one bullet being pulled for every round fired.

20       Q    And the reason why Mr. Naples was not required

21   to either flex or extend his right finger was that once

22   the gun discharged, it caused the rebound effect to

23   brush his stationary finger, which then continued to

24   discharge the weapon; correct?

25       A    It's multiple operations.  But, yes.

```
 1        Q    All right.

 2        A    That's what bump fire is.

 3        Q    Now, I'm not -- I'm not referring to you

 4   personally --

 5        A    I understand.

 6        Q    -- on this next question.

 7        A    Okay.

 8        Q    I'm not referring to you personally.

 9             Isn't it true, though, for the overwhelming

10   majority of individuals, the Slide Fire Solutions®

11   device can be dangerous?

12        A    No.  It's a plastic stock.  It would have to

13   be used in conjunction with other things and used in an

14   unsafe manner.

15        Q    Let me see if I can then explain.

16        A    All right.

17        Q    Let me see if I can say it differently.

18        A    Sure.

19        Q    Isn't it true that for the majority of

20   individuals the utilization of a Slide Fire Solutions®

21   device on a rifle, installed on a rifle, is dangerous?

22        A    As dangerous as all guns.  I have to say with

23   that qualifier because all guns are dangerous.  So it is

24   neither any more or any less dangerous than a gun.

25        Q    Isn't it true that for the majority of
```

1    individuals, when they're firing a rifle with a Slide

2    Fire Solutions® device or a comparable device on there,

3    it's hard to control the accuracy of the firing?

4         A    True.

5         Q    Mr. Naples commented to me when he was done

6    discharging the rifle with the Slide Fire Solutions®

7    device that he thought it was difficult to hit the

8    broadside of a barn.  Would you agree with that

9    statement?

10        A    I don't know how accurate Mr. Naples is, but

11   it was -- as with any bump fire, it's difficult.

12        Q    All right.  Wouldn't you agree, then, with the

13   -- with the majority of individuals who would attempt to

14   discharge a rifle with the Slide Fire Solutions® device

15   installed on it, it may be difficult for them to control

16   the accuracy of the firing?

17        A    That's true.

18        Q    All right.

19        A    Hard to hit what you're shooting at.

20        Q    And isn't it true that when you install that

21   Slide Fire Solutions® device to a semiautomatic weapon,

22   it -- and you discharge the weapon, it discharges

23   similarly to an automatic weapon?

24        A    No.

25        Q    Explain why you say no.

 1      A    One trigger is pulled every time it fires.

 2  Also, an automatic weapon is more accurate, if you can

 3  say that, although both are not very accurate than a

 4  bumping and bump firing, as I said before about the

 5  Slide Fire®.

 6      Q    With an automatic weapon, you only need to

 7  initiate one operation to get multiple bullets out of

 8  the weapon; correct?

 9      A    Correct.

10      Q    All right.

11      A    It is -- shoots or designed to shoot more than

12  one round per trigger pull without manual reloading.

13  That is the federal definition of a machine gun.

14      Q    Now, are you aware that the NRA bans from its

15  gun ranges weapons that have installed on it devices

16  similar to the Slide Fire Solutions® device?

17      A    No.  It doesn't surprise me.

18      Q    All right.  Have you ever personally gone to

19  an indoor gun range with a Slide Fire Solutions® device,

20  or something similar to it, what's now -- you know, I

21  think you've referred to it as a bump stock device --

22      A    Yes.

23      Q    -- discharged it inside the -- the indoor

24  range and been asked to leave?

25      A    Because of the bump stock?

1      Q     Correct.

2      A     No.  No.

3      Q     Would you agree with me that the Slide Fire

4  Solutions® device, or something similar to it, is not a

5  device that is in common use?

6      A     They are in common use.  Millions have been

7  sold.  They are in common use.

8      Q     Have you ever, yourself, gone to a gun range

9  and seen individuals there discharging rifles with a

10  Slide Fire Solutions® type device on it?

11      A     Yes.  That's why I bought mine.

12      Q     All right.  Would you agree with me that the

13  Slide Fire Solutions® device or something similar is a

14  device that you might characterize as being unusual?

15      A     No.

16      Q     You would agree with me that attaching a Slide

17  Fire Solutions® device to a rifle would not be something

18  you would be doing if you wanted to use the weapon for

19  self-defense?

20      A     No.  No.

21           MR. BOWDEN:  Okay.  And let's take a break.

22           (There was a short break.)

23  BY MR. BOWDEN:

24      Q     Let's go over some basic concepts, if we can,

25  for a minute.  With a semiautomatic weapon that's not

```
 1    altered in any way, you have one action of your finger,

 2    which is usually pulling the trigger --

 3         A    Uh-huh.

 4         Q    -- that results in one bullet leaving the gun;

 5    correct?

 6         A    Correct.

 7         Q    All right.  So each time you want another

 8    bullet to leave the gun, you need to activate your

 9    trigger finger, like, flex your finger in order to pull

10    the trigger; correct?

11         A    It's not necessary.

12         Q    With a semiautomatic weapon?

13         A    Correct.

14         Q    Well, isn't there a one-to-one relationship?

15    In other words, you pull the trigger, a bullet comes

16    out.  Not -- now, I'm not referring to what you think

17    can be done with what I saw in the video.  In the

18    typical situation, in a typical situation, isn't it true

19    that with a semiautomatic weapon, there's a one-to-one

20    relationship, which means a trigger pull equals one

21    bullet; you want another bullet to come out of the

22    weapon, you need to pull the trigger again?

23         A    The trigger needs to be activated.

24         Q    Okay.  And by "activated," you mean pull the

25    trigger?
```

1       A       Pressed and moved, yes.

2       Q       Right.

3               Okay.  Activate -- one activation, in the

4   overwhelming number of instances, when you activate the

5   trigger once, you get one bullet?

6       A       Yes.

7       Q       All right.  You want to get another bullet out

8   of the gun, you have to activate the trigger a second

9   time?

10      A       Correct.

11      Q       And, again, in the overwhelming number of

12  instances, that means pulling the trigger?

13      A       Correct.

14      Q       All right.  However, on the other hand, with

15  an automatic weapon, that's a little different.  When

16  you activate by pulling the trigger, you get more than

17  one bullet; correct?

18      A       Fully automatic, correct.

19      Q       All right.  So one action of the finger in a

20  fully automatic weapon results in more than one bullet;

21  true?

22      A       Correct.

23      Q       All right.  Now, the bolt, the hex bolt, that

24  you produced that was inserted into the rifle, in the

25  overwhelming number of ordinary circumstances, that

1    still resulted in a situation where you would pull the

2    trigger and get one bullet out of the weapon?

3         A    Correct.

4         Q    And if you wanted another bullet,

5    notwithstanding the fact that that hex bolt was in

6    there, if you wanted another bullet, you had to pull the

7    trigger again?

8         A    Correct.

9         Q    So there's -- again, there's a one-to-one

10   relationship; one pull of the trigger equals one bullet?

11        A    Correct.

12        Q    Another pull of the trigger, you get another

13   bullet?

14        A    A pull and release of the trigger, correct.

15        Q    All right.  That -- that hex bolt, in ordinary

16   circumstances when you inserted that into the weapon, it

17   didn't turn that weapon into an automatic weapon?

18        A    That's true.

19        Q    All right.  Didn't convert it from a

20   semiautomatic to an automatic?

21        A    Correct.

22        Q    Okay.  Now, you referred to a number of things

23   in the complaint that apparently you didn't have and

24   bring to the gun range.  So, for example, in the

25   complaint you referred to a two-stage or multistage

1    trigger; correct?

2        A    Correct.

3        Q    But you don't and didn't own a two-stage or

4    multistage trigger and didn't bring that to the gun

5    range?

6        A    Correct.

7        Q    However, even with a two-stage or a multistage

8    trigger, the operation of the weapon is such that you

9    get one bullet come out for one operation of the

10   trigger?

11       A    Correct.

12       Q    And it doesn't allow a firearm to discharge

13   more than one bullet for one operation of the trigger?

14       A    Correct.

15       Q    You also referred in the complaint to a short

16   reset trigger?

17       A    Yes.

18       Q    And you don't have -- didn't have and didn't

19   bring to the gun range a short reset trigger?

20       A    The hex bolt acted as a short reset.

21       Q    Okay.  But there are -- you can create a short

22   reset trigger in other ways as well?

23       A    Yes.

24       Q    All right.  And in all those other ways that

25   you could create a short reset trigger, other than

1    installation of a hex bolt, the same thing applies?

2         A    Correct.

3         Q    That means one operation of the trigger equals

4    one bullet?

5         A    Correct.

6         Q    And it doesn't allow a firearm, and the

7    semiautomatic firearm, to discharge more than one bullet

8    per one trigger pull?

9         A    That's correct.

10        Q    Okay.  And you also referred in the complaint

11   to an adjustable trigger, and you did not have -- don't

12   have and didn't bring to the gun range on September 20th

13   an adjustable trigger?

14        A    The hex bolt acted as an adjustable trigger.

15        Q    Okay.  Other than the installation of the hex

16   bolt, which then affected the trigger to, in effect, act

17   as an adjustable trigger, there are other ways to create

18   an adjustable trigger?

19        A    Yes.

20        Q    All right.  So referring now to all those

21   other ways you can create an adjustable trigger --

22        A    Correct.

23        Q    -- the operation of the weapon is similar as

24   we had talked about with the short reset trigger and the

25   two-stage or multistage trigger, which is that you get

1    one bullet per one operation of the trigger?

2         A    Correct.

3         Q    And it does not allow the firearm to discharge

4    more than one bullet per trigger pull?

5         A    That's correct.

6         Q    Okay.  Now, you referred in the complaint to a

7    trigger assembly or a trigger pack?

8         A    Yes.

9         Q    You didn't have with you at the gun range on

10   September 20 a trigger assembly or a trigger pack.  But

11   what a trigger assembly or trigger pack is, isn't that

12   just simply the collection of parts that comprise the

13   trigger?

14        A    Some weapons have a trigger pack rather than

15   installed parts.  The MP5, for example, has a trigger

16   pack.  My MP5 has a trigger pack rather than a separate

17   hammer, trigger, disconnect all housed in the receiver.

18        Q    The trigger assembly is simply a term that

19   refers to that portion of the gun that has the trigger

20   and components surrounding the trigger?

21        A    A Geissele trigger, for example --

22        Q    Is that a yes or no?

23        A    Repeat the question again.

24             MR. BOWDEN:  Okay.  Could you read the

25        question?  The trigger and the surrounding

1       components.

2               (The court reporter read the pending

3       question.)

4               THE WITNESS:  It could be construed, but it

5       wasn't what I was referring to in the complaint.

6   BY MR. BOWDEN:

7       Q    Okay.  Well, when you're referring to the

8   trigger pack in the complaint, explain what you were

9   referring to.

10      A    A trigger pack is what is commonly used on G3,

11  MP5, HK33 style weapons, and it is a collection of

12  components that are to fire the weapon.

13      Q    Okay.

14      A    And that's -- some include sears, which are

15  not included in the AR-15.

16      Q    Well, it's not a part, it's not a device, it's

17  just the collection of the components within the gun;

18  you refer to that as the trigger pack; is that correct?

19      A    It could be a tool.

20      Q    A trigger pack?

21      A    Could be a tool.  Tool doesn't necessarily

22  just have one part.

23      Q    All right.  Well, isn't the trigger assembly

24  nothing more than the collection of -- of the components

25  of the gun?  It's not a part or a device?

1      A    It's a conversion kit.

2      Q    Oh, okay.

3           All right.  Well --

4      A    The law is badly worded.

5      Q    Whether you have a trigger assembly or whether

6  you have a trigger pack on a semiautomatic weapon, that

7  -- having that with the weapon, isn't it true that that

8  does not alter the one-to-one relationship of needing to

9  pull the trigger once to get one bullet?

10     A    That's correct.

11     Q    And to get another bullet you need to pull the

12 trigger again?

13     A    Trigger needs to be activated.

14     Q    And you need to activate or pull the trigger a

15 second time to get a second bullet?

16     A    Correct.

17     Q    All right.  Finally, in the complaint you

18 referred to a fire control group.  Again, that's not

19 a -- the fire control group itself is not a device or an

20 item, it's instead a collection of the parts?  It's the

21 part of the gun that you might think of where it

22 controls the trigger's operation.  It's a collection of

23 parts, basically; right?

24     A    It consists of the hammer, trigger,

25 disconnect, and springs and pins.  On a fully automatic

1   weapon, that includes auto sear.

2        Q    Okay.  All right.  Why don't we do this now.

3   We're going to watch the video that the videographer

4   made that I'm going to give you.

5        A    Okay.

6        Q    And if we were standing around, I don't know,

7   taking a break and doing all sorts of things that didn't

8   relate to shooting guns and taking parts on and off, as

9   you may notice, he was stopping and starting his camera.

10  So the video does not contain us standing around and

11  walking out to take a break.

12       A    Mine does.

13       Q    Okay.  But his doesn't.  So it's simply the

14  meat.  It's an accumulation of all the different

15  sequences of what we did at the --

16       A    Okay.

17       Q    -- High Noon Guns gun range.

18       A    Okay.

19       Q    What I want to do is watch that with you.

20       A    Absolutely.

21       Q    I'm going to ask you to verify that that was

22  you, that was me, that was Mr. Naples, and that that

23  video is, in fact, fairly representative of us on that

24  day there.

25       A    That's what happened.

```
 1        Q    I may ask you some other questions after you

 2   watch it, too, as well.

 3        A    Sure.

 4             MR. BOWDEN:  Okay.  Let's go off the record.

 5             (There was a brief off-the-record discussion,

 6        after which the following proceedings were had:)

 7             MR. BOWDEN:  We're going to mark that video.

 8             THE WITNESS:  I am going to give you some

 9        URLs, by the way, before we leave.  I didn't know

10        it would be this long.  So I have my laptop.  I'm

11        going to send it to you via email anyway.  I just

12        want to make sure you get the stuff before it's

13        time to go.

14             MR. BOWDEN:  All right.

15   BY MR. BOWDEN:

16        Q    Mr. Roberts, you just watched the video of our

17   appearance at High Noon Guns on September 20th, 2018,

18   and I'm marking that now, that video, as Defendant's

19   Exhibit 6.

20             After having watched that video, does it

21   fairly and accurately represent all the activities on

22   September 20th at High Noon Guns?

23        A    Yes.

24        Q    In particular, does it fairly and accurately

25   represent the devices and the items that you brought to
```

1   High Noon Guns, that being the Slide Fire® item, the hex

2   bolt, and the screwdriver?

3        A    They were --

4        Q    What I'm asking you is:  Is that what you

5   brought and does the video fairly and accurately

6   represent it?

7        A    Those are the proper devices that were brought

8   there.

9        Q    I'm not asking -- in effect, I'm not asking

10  you anything other than did I misrepresent something

11  when I put the video together?

12       A    No, nothing was misrepresented at all.

13       Q    All right.

14       A    The expert may have, but ....

15       Q    As the items that were depicted there that you

16  brought --

17       A    Yes, the items are fine.

18       Q    -- that fairly and accurately --

19       A    I do have an issue with the expert, obviously.

20       Q    -- represents that.

21            (Defendant's Exhibit 6 was marked and retained

22  by Mr. Bowden.)

23  BY MR. BOWDEN:

24       Q    Okay.  All right.  Quickly, in terms of what

25  you saw and what we did, first what Mr. Naples did was

1   he fired your AR rifle with the original butt stock and

2   pistol grip on it; correct?

3       A    Correct.

4       Q    And every time he pulled the trigger, he

5   discharged a single round?

6       A    Correct.

7       Q    And to discharge multiple rounds, he had to

8   pull and release the trigger multiple times?

9       A    Correct.

10      Q    So with the stock -- original butt stock and

11  pistol grip that you had on it, it did not discharge

12  more than one round per single operation of the trigger?

13      A    Correct.

14      Q    All right.  Then the second thing that

15  happened was Mr. Naples removed the butt stock and

16  pistol grip that you had on there and installed the

17  Slide Fire Solutions® device, which we're all referring

18  to as the bump fire stock device; correct?

19      A    Correct.

20      Q    All right.  Then what he did at that point to

21  fire the weapon was he pushed -- he used his left hand

22  to push the front portion of the rifle forward; correct?

23      A    Okay.  Correct.  I believe it was his left

24  hand.  He is right-handed.

25      Q    And then, after applying that forward pressure

```
 1    to the front part of the firearm, that caused the

 2    trigger to come in contact?

 3         A    Correction.  I believe it was his right hand

 4    that was pulled forward.

 5         Q    Well, he pulled the weapon forward with his

 6    left hand; right?  He applied --

 7         A    That's correct, yes.

 8         Q    Okay.

 9         A    I used to own two of those, and one was

10    left-handed, the other was right-handed.  My apologies.

11         Q    And when he applied that pressure pushing

12    forward with his left hand, it caused the trigger to

13    come in contact with the trigger finger --

14         A    Yes.

15         Q    -- thereby discharging the firearm?

16         A    Yes.

17         Q    And he stood there continuously applying

18    forward pressure with his left hand and the recoil, in

19    addition to that forward pressure, caused the rifle to

20    rapidly and repeatedly rock or bump back and forth;

21    correct?

22         A    Repeat that again.

23              (The court reporter read back the pending

24    question.)

25              THE WITNESS:  I believe that is correct.
```

```
 1   BY MR. BOWDEN:

 2        Q    Okay.  Thereby resulting in the discharge of

 3   multiple rounds?

 4        A    I'd like to say one round per trigger pull,

 5   just to clarify.  But, yes.

 6        Q    Well, there was -- again, just to repeat, I

 7   think the basics of the operation of what I'm trying to

 8   establish, he took, himself -- he physically took one

 9   affirmative action, which is to push forward, and after

10   that, with the bump fire solution device on it, he took

11   no other affirmative actions, he just stood there and

12   held the weapon?

13        A    I can't say that's correct because the trigger

14   has to be pulled and activated.

15        Q    But the trigger was not pulled due to any

16   action by him?

17        A    It was.  It was pulled by his actions for

18   sure.

19        Q    Did you -- again, I don't want to repeat the

20   questions I have before.  Did you see him flexing his

21   finger?

22        A    His finger was not flexed, it was held

23   stationary.

24        Q    All right.  Okay.  And after continuously

25   applying that forward pressure, I think once he got the
```

1    hang of it, the -- the rifle fired all the rounds and

2    only stopped when the magazine was empty; correct?

3         A    Correct.

4         Q    Okay.  Then we switched on to the weapon that

5    had the -- the hex bolt, and the first thing that we did

6    was we removed the original hex bolt that attached the

7    pistol grip and replaced it with the hex bolt that you

8    had modified; correct?

9         A    Correct.

10        Q    And then we fired the weapon with the hex --

11        A    I'd like to make a correction.  Sorry.  The

12   modified hex bolt was already installed into the

13   weapon --

14        Q    Okay.

15        A    -- and we fired it that way first.  And then

16   afterward we took that hex bolt out and replaced it with

17   a standard hex bolt.

18        Q    I understand.  Let me go back.

19        A    Sure.

20        Q    So once we used the weapon that had the hex

21   bolt in it, we fired the weapon with the modified hex

22   bolt that you had installed into the weapon, that's the

23   first thing that Mr. Naples did; right?

24        A    Uh-huh.

25        Q    Correct?

```
 1        A     I'm sorry.  You've got to repeat that again.

 2        Q     Okay.  All right.  After we put the weapon

 3   away that had the Slide Fire Solutions® device on it --

 4        A     Okay.

 5        Q     -- we were done with that testing --

 6        A     The M4A1.

 7        Q     Correct.

 8              -- we then moved on to the rifle that had in

 9   it the modified hex bolt?

10        A     Correct.

11        Q     And Mr. Naples loaded that weapon, and he

12   fired it with the modified hex bolt in the weapon?

13        A     Correct.

14        Q     And what we saw there was that when he fired

15   it, he had to pull the trigger every time he wanted one

16   bullet to come out?

17        A     Correct.

18        Q     We removed the modified hex bolt then and then

19   installed the original unmodified hex bolt.  Mr. Naples

20   loaded the weapon and again fired it, but we saw the

21   same thing, which was that he had to pull the trigger

22   each time he wanted one bullet to come out?

23        A     Correct.

24        Q     So it was one trigger pull for one bullet.  He

25   had to pull the trigger again for another bullet.  That
```

1    was the situation with that weapon whether it had the

2    modified hex bolt in it or didn't have the modified hex

3    bolt in it; correct?

4        A    Correct.

5        Q    Sorry?

6        A    Correct.

7        Q    All right.

8        A    The difference between both the modified and

9    unmodified hex bolt without regards to -- the difference

10   between the modified and unmodified bolt, that one round

11   is fired per trigger pull.

12       Q    All right.  And the only difference, the only

13   change with the modified hex bolt was that the -- the

14   reset distance of the trigger, that is the amount that

15   the trigger would move after having been pulled, was

16   reduced?

17       A    Creep was also eliminated.

18       Q    Okay.  And -- and, just for the record, in

19   case the judge doesn't know what creep is, would you

20   explain what creep is?

21       A    Creep is the amount of distance the trigger

22   moves before the trigger breaks.  By "trigger breaks," I

23   mean by activation of either the sear or tripping off

24   the disconnect firing the hammer -- or releasing the

25   hammer to fire the weapon.  Sorry.

```
 1        Q    All right.  At this point in the deposition,
 2   what I'd like to do --
 3        A    What's this?  It's mine too?
 4        Q    It's yours too.
 5        A    Videos?
 6        Q    These are yours.
 7        A    Oh, these are my videos.
 8        Q    Just remember that number two is the video
 9   that I'm giving you that we watched originally --
10        A    Okay.
11        Q    -- at the High Noon Guns.
12        A    Gotcha.
13        Q    And number one are your videos, but not the
14   ones that you gave me that were the videos you made at
15   High Noon Guns --
16        A    They were the ones that the bump firing --
17        Q    Exactly.
18        A    Okay.  Gotcha.
19        Q    Yes.  That's for you.  You can keep that.
20        A    Okay.
21        Q    I've got another.
22             I'm going to call these videos up, and we're
23   going to watch them.
24        A    Okay.
25        Q    And then we're going to talk about them after
```

 1  we watch them.

 2       A    Do they play okay?

 3       Q    Yeah, except for the one that I said I'd try

 4  to rotate, but we couldn't rotate it.  So, for now,

 5  we're going to play a video.

 6       A    Are we on the record?

 7       Q    Yes.  Let me back up for a second.

 8            Mr. Roberts, I'd like to mark, finally, as

 9  Exhibit 7 a flash drive that has five videos on it.

10  These are five videos that you produced to me.

11       A    Okay.

12       Q    And they're numbered.  The first video is

13  numbered 8617, the second video is numbered 8628, the

14  third video is numbered 8673, the fourth video is

15  numbered 8674, and the fifth video is numbered 8675.

16            First what we're going to do is we're going to

17  watch video 8617, the first one, and then I'm going to

18  ask you some questions about it.

19       A    Okay.

20            MR. BOWDEN:  Let's go ahead and watch that

21       video.  We can go off the record.

22            (Defendant's Exhibit 7 was marked and retained

23       by Mr. Bowden.)

24            (There was a brief off-the-record discussion,

25       after which the following proceedings were had:)

1   BY MR. BOWDEN:

2       Q    As to the first video that you made, which was

3   8617, all you're doing in that video, as I understand

4   it, is you're inserting the modified hex bolt into the

5   weapon, and that's the same thing that you did at High

6   Noon Guns; correct?

7       A    Correct.  The only difference is the pistol

8   grip was removed for clarity.

9       Q    Okay.  Again, the effect on the weapon is that

10  there be a shorter reset, you said the creep, I think,

11  was -- was short?  Was removed?

12      A    Eliminated.

13      Q    Eliminated.

14          Okay.  Again, though, there's a separate pull

15  of the trigger for each separate bullet that you want to

16  fire?

17      A    Correct.

18          MR. BOWDEN:  All right.  Let's go off the

19      record and we'll look at video 8674.

20          (There was a brief off-the-record discussion,

21      after which the following proceedings were had:)

22  BY MR. BOWDEN:

23      Q    Let's talk about what we saw in video 8674.

24  In that one, it was a similar type of situation as what

25  we did at High Noon Guns, which was that you put the

1   Slide Fire® device on the AR rifle and you fired it,

2   demonstrating that the effect was that it would fire

3   multiple rounds with one operation of the weapon;

4   correct?

5        A    It does not fire multiple rounds with one

6   operation of the weapon.

7        Q    Well, then let me back up and just go more

8   basic than that.

9             Is video 8674 simply a repeat of what occurred

10  at High Noon Guns, which was the attachment of the Slide

11  Fire Solutions® device to the AR weapon and you were

12  attempting to demonstrate how it bump fired?

13       A    Correct.  It was a demonstration of the bump

14  fire --

15       Q    Okay.

16       A    -- with a Slide Fire® stock installed;

17  correct.

18            MR. BOWDEN:  Okay.  Let's go off the record.

19            (There was a brief off-the-record discussion,

20       after which the following proceedings were had:)

21  BY MR. BOWDEN:

22       Q    Now, we're referring to video 8674, and we

23  just watched that video.

24            What is the purpose of that video and what

25  were you trying to demonstrate?

1          A     That a Slide Fire® stock is not required to

2     bump fire.  It does not alter the rate of fire of the

3     weapon in any way, shape or form.

4          Q     To get that weapon to discharge multiple

5     rounds, can you explain how you did that?

6          A     I held my finger stationary while I pulled

7     forward, exactly the way I did with the Slide Fire®.

8          Q     And you did not brace the end of the gun

9     against your chest or your shoulder?

10         A     It's not required.

11         Q     But what you did was you held it out away from

12    you applying pressure with your left and right hands so

13    you aren't -- the weapon wasn't braced against your

14    body, and you were allowing it -- after you fired it

15    initially, you were allowing it to rock back and forth

16    away from you, and that's how you were able to discharge

17    multiple rounds; correct?

18         A     I would say that's correct.

19         Q     Okay.  In addition, in video 8674, that

20    particular weapon did not have a sear pin in it; true?

21         A     No.

22         Q     Okay.

23         A     I just want to be on the record saying there

24    was no sear, no auto sear, no machine gun parts that

25    would convert it to a machine gun.

1      Q     Now, the -- the weapon that you used in video

2   8674 did not have any device or item added to the

3   weapon?

4      A     Nothing.

5          MR. BOWDEN:  All right.  Let's go off the

6      record and we're going to look at video 8675.

7            (There was a brief off-the-record discussion,

8      after which the following proceedings were had:)

9          MR. BOWDEN:  What did I call the last one?

10     Off the record.

11           (There was a brief off-the-record discussion,

12     after which the following proceedings were had:)

13         MR. BOWDEN:  We've watched three videos thus

14     far.  The first one, in the event that there was

15     some confusion about the numbering, the first video

16     that we watched and I asked Mr. Roberts about was

17     8617, and I believe we correctly numbered that.

18           However, the second video that we watched and

19     that I asked Mr. Roberts about, which was the one

20     where he added the Slide Fire Solutions® device,

21     that was actually video 8628.

22           And then, finally, the third video we just

23     watched and I asked Mr. Roberts about was video

24     8673.

25           So if, on the record, I gave the videos

1    different numbers, again, the second video is 8628

2    and the third video is 8673.

3        Now we're about to watch off the record, and

4    then I'll ask Mr. Roberts some questions about it,

5    video 8674, the one that should be referred to

6    accurately as video 8674.

7        Let's go off the record.

8        (There was a brief off-the-record discussion,

9    after which the following proceedings were had:)

10   BY MR. BOWDEN:

11   Q    I'm going to ask Mr. Roberts some questions

12   about video 8674, which is the fourth video that we've

13   now watched.

14       For that weapon, it did not have the sear pin

15   installed in that weapon; correct?

16   A    There was no sear installed.

17   Q    All right.  And --

18   A    No sear or sear pin installed.  It cannot

19   accept one.

20   Q    To get multiple rounds to fire from that

21   weapon, what he did, again, in that video was he

22   asserted pressure with his left hand at the end of the

23   -- at the weapon, again, he was holding steady or

24   holding pressure as well with his right hand, and he --

25   once he pulled the trigger, he let the rebound and

1    recoil of the gun allow the gun to rock back and forth

2    loosely, and he wasn't bracing that weapon against his

3    shoulder and his cheek?

4         A    That's true, as far as I could see it.

5         Q    What point were you attempting to establish in

6    that video?

7         A    That the Florida Statute 790.222 does not

8    apply to a Slide Fire®.  It may have the same name as

9    bump fire stock, but it just doesn't fit the definition.

10        Q    All right.  Now we're going to look at the

11   final video, and it's video 8675.

12        A    All right.  We're going off the record?

13             MR. BOWDEN:  Sure, yeah.

14             (There was a brief off-the-record discussion,

15        after which the following proceedings were had:)

16   BY MR. BOWDEN:

17        Q    Mr. Roberts, with regard to video 8675, you

18   used an AK rifle in that video; correct?

19        A    Correct.

20        Q    And that rifle also did not have a sear pin?

21        A    There was no sear or sear pin installed.

22        Q    And in order to get that rifle to discharge

23   multiple rounds with one trigger pull, you continued to

24   apply a left -- pressure with your left hand, pressure

25   with your right hand, and you did not brace the weapon

1    against your shoulder or your cheek or any other part of

2    your body, you just discharged it and then let the

3    rock -- the back-and-forth rocking of the weapon result

4    in multiple discharges?

5         A    Correct.

6         Q    And what point were you making there?

7         A    I was showing that you could bump fire without

8    a bump stock and that bump fire doesn't apply just only

9    to the AR style weapons, it also applies, quite

10   beautifully I have to say, to AK style weapons as well

11   or any other semiautomatic, even a handgun.

12        Q    And your point in that video, as well as the

13   prior two videos that use the AR weapon, is not that the

14   AR and the AK are banned by the statute, that's not your

15   point, is it?

16        A    No.

17             MR. BOWDEN:  Okay.  Let's go off the record.

18             (There was a brief off-the-record discussion,

19        after which the following proceedings were had:)

20             MR. BOWDEN:  All right, Mr. Roberts.  I don't

21        have any other questions for you today.

22             The only thing that I can tell you at the end

23        of the deposition is that you have a right to read

24        the transcript when it's typed up to see that the

25        court reporter prepared everything correctly, or

1     you can waive that and just rely on the court

2     reporter accurately typing down what you said.

3          Right now you need to tell her what you want

4     to do because she's going to type that up this

5     weekend so we have it before Tuesday.

6          THE WITNESS:  Can I look at that in my spare

7     time?

8          MR. BOWDEN:  You have to take that up with

9     her.

10          (There was a brief off-the-record discussion,

11     after which the following proceedings were had:)

12          (This deposition was concluded at 4:15 p.m.

13     Reading and signing of this deposition was not

14     waived.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA        )

COUNTY OF MANATEE        )

     I, Julie K. Harvey, RPR, FPR, Notary Public, State

of Florida, certify that ADAM ROBERTS personally

appeared before me on this 19th day of October, 2018,

and was duly sworn.

     WITNESS my hand and official seal this 22nd day of

October, 2018.

NOTARY PUBLIC
STATE OF FLORIDA
JULIE K. HARVEY
MY COMMISSION # FF 183804
EXPIRES: April 14, 2019
Bonded Thru Budget Notary Services

Julie K. Harvey, RPR, FPR
Notary Public – State of Florida
My Commission No.:  FF 183804
Expires:  April 14, 2019

Personally Known _____

Produced Identification __X___

Type of Identification Produced _____FL DL_____

```
 1              R E P O R T E R 'S   C E R T I F I C A T E

 2

 3    STATE OF FLORIDA    )

 4    COUNTY OF SARASOTA  )

 5

 6        I, JULIE K. HARVEY, Registered Professional

 7    Reporter, Florida Professional Reporter, do hereby

 8    certify that I was authorized to and did

 9    stenographically report the deposition of ADAM ROBERTS;

10    that a review of the transcript was requested; and that

11    the foregoing transcript, pages 4 - 104, is a true

12    record of my stenographic notes.

13        I FURTHER CERTIFY that I am not a relative,

14    employee, or attorney, or counsel of any of the parties,

15    nor am I a relative or employee of any of the parties'

16    attorney or counsel connected with the action, nor am I

17    financially interested in the action.

18        DATED this 22nd day of October, 2018, at Venice,

19    Sarasota County, Florida.

20

21                      _____

22                      JULIE K. HARVEY, RPR, FPR

23

24

25
```

```
1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3           CASE NO:  8:18-CV-1062-T-33TGW

4
     ADAM WAYNE TYLER ROBERTS,
5
               Plaintiff,
6
     v.
7
     RICK SWEARINGEN,
8
               Defendants.
9    _____

10

11
     DEPOSITION OF:  ADAM ROBERTS
12
     TAKEN:  10/19/2018
13

14
     DATE SENT TO WITNESS:  _____10/22/2018_____
15

16

17
     TO:  Mr. Roberts
18        adam@bumpstocklegalaction.com

19

20

21   Dear Mr. Roberts :

22   The referenced transcript has been completed and is
     enclosed for you to read and sign.
23

24

25
```

1

2      Please read the deposition transcript and record any
       changes on the enclosed errata sheet.  When reading and
3      signing has been completed, please mail the original
       errata sheet to Albert J. Bowden, Esquire, Special
       Counsel, Office of the Attorney General, PL-01, The
       Capitol, Tallahassee, Florida 32399-1050, and keep a
4      copy for your records.

5

6      Please take care of this matter within 30 days.

7      The original and copy of this deposition have been
       forwarded to the ordering parties, and the errata, once
       received, will be placed in the transcripts.

8

9      If you wish to waive your right to read and sign, please
       sign your name at the bottom of this letter and send it
       back to our office at P. O. Box 2005, Sarasota, FL
10     34230.

11     Should you have any questions, please call.
       Thank you for your cooperation in this matter.

12
       Sincerely,

13

14
       Julie K. Harvey, RPR, FPR

15

16

17

18     I do hereby waive my right to read and sign.

19
       _____
20     (Adam Wayne Tyler Roberts)

21

22     cc:  Albert J. Bowden, Esquire

23

24

25

```
 1                         ERRATA SHEET

 2

 3    IN RE:  Roberts vs Swearingen      8:18-CV-1062-T-33TGW

 4    Deposition of:  Adam Roberts        Taken:  10/19/18

 5    Please read your deposition transcript, making all
      changes below. DO NOT WRITE ON THE TRANSCRIPT.
 6
      Page #      Line #      Change     Reason
 7    _____      _____      _____
      _____      _____      _____
 8    _____      _____      _____
      _____      _____      _____
 9    _____      _____      _____
      _____      _____      _____
10    _____      _____      _____
      _____      _____      _____
11    _____      _____      _____
      _____      _____      _____
12    _____      _____      _____
      _____      _____      _____
13    _____      _____      _____
      _____      _____      _____
14    _____      _____      _____
      _____      _____      _____
15    _____      _____      _____
      _____      _____      _____
16    _____      _____      _____
      _____      _____      _____
17    _____      _____      _____
      _____      _____      _____
18    _____      _____      _____
      _____      _____      _____
19

20

21    Under penalties of perjury, I declare that I have read
      the foregoing document and that it is true and correct,
22    subject to any changes entered here.

23    _____  _____

24    Signature                     Printed Name        Date

25    CC:  Albert J. Bowden, Esquire
```